UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Allen STOUT, John Mark
Johnson, Defendants-Appellants.

No. 80–5815.

United States Court of Appeals,
Eleventh Circuit.

Feb. 16, 1982.

J. Daniel Ennis, Indian Harbour Beach, Fla., for Stout.

H. Jay Stevens, Asst. Federal Public Defender, Orlando, Fla., for Johnson.

Joseph T. Urbaniak, Jr., Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before MORGAN, HILL and KRAVITCH, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

On April 22, 1980, defendants-appellants, John Mark Johnson and Charles Allen Stout, were arrested at the Melbourne, Florida airport by agents of the Bureau of Alcohol, Tobacco and Firearms (BATF). The defendants were subsequently indicted on thirteen counts of making, possessing and transferring firearms in noncompliance with the requirements of the National Firearms Act of 1968, 26 U.S.C. 5801 et seq. At trial, a jury returned a verdict of guilty on twelve of the counts.[1] Stout and Johnson were sentenced on each count to one and two years imprisonment, respectively, with the sentences to run concurrently. It is from these convictions and sentences that defendants now appeal.

I

Defendants' arrests marked the culmination of a seven week undercover operation by BATF Special Agent Charles Hudson and BATF Special Employee Gary Peacock. Hudson and Peacock met defendant Johnson for the first time on March 4, 1980 at a motel room in Fort Lauderdale, Florida. The meeting had been arranged by a police informant named Albert Willis. Willis had importuned Johnson to travel from Melbourne, Florida to Fort Lauderdale and negotiate the sale of a MAC–10 submachine gun owned by Johnson. Peacock and Hudson, the purported potential buyers, were represented to Johnson as narcotics and weapons traffickers, who were interested in purchasing automatic weapons[2] for use in South America.

During their initial meeting, Johnson showed Hudson and Peacock the submachine gun, claiming that it was a sample of the type of firearms he could provide in large quantities. Johnson also discussed the functioning of silencers, which as a machinist, he claimed the ability to make. A price per unit for automatic weapons was negotiated, and Johnson agreed that he would supply machine guns equipped with silencers for $2,500 each. Johnson expressed reluctance to sell the submachine gun that he then had with him because it was registered in his wife's name. The two agents were allowed, however, to leave the motel with the firearm for the reputed purpose of showing it to their South American contacts.

Two more brief meetings were arranged in Fort Lauderdale prior to Johnson's return to Brevard County on March 6. At a second meeting the evening of March 4, Hudson gave Johnson a "Hi-Standard" .22 caliber pistol barrel and asked Johnson if he had a silencer that would fit it. Johnson took the barrel saying that he would see what he could do about getting a silencer to adapt to it.

The next encounter between Hudson, Peacock and Johnson occurred in Melbourne, Florida on March 26, 1980. Johnson met the agents at the Melbourne airport and took them to a rural area of Brevard County. There Johnson displayed five silencers and two handguns. One of the silencers was attached to the .22 caliber pistol barrel that Johnson had been given at

---

1. Defendants were convicted of possessing firearms that had not been registered to them in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5861(d) and 5841 (Counts 3, 5, 8 and 10); transferring and making firearms without having paid the transfer and making taxes as prescribed by 26 U.S.C. § 5861(e) in conjunction with 26 U.S.C. §§ 5811 and 5821 (Counts 4, 6, 7, 9 and 11); possessing firearms not identified by serial number in contravention to 26 U.S.C. § 5842 (Count 12); possessing a firearm that had its serial number obliterated in violation of 26 U.S.C. §§ 5861(h) and 5871 (Count 13); and conspiring to commit the preceding offenses.

. Johnson and Stout were also charged with engaging in a business as dealers in firearms without having paid the occupational tax required by 26 U.S.C. § 5801 and without having registered in accordance with 26 U.S.C. § 5802 (Count 2). This count, however, was dismissed prior to the submission of the case to the jury.

2. A fully automatic weapon or machine gun is "any weapon which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

the second March 4 meeting. The barrel had been altered, the front sight was removed and a portion of the barrel threaded. Hudson and Peacock test-fired one of the pistols with silencer attached, and there was a discussion over the sale of both pistols. The two agents and Johnson next drove to a sparsely populated section of Melbourne where they were met by defendant Stout. The silencers and pistols were again displayed, and Stout accepted the agents' praise for the quality of the work exhibited. Stout asked which of two alternative means of attaching the silencers to firearms the agents would prefer, stating that he could make either kind.

At one point, Johnson expressed concern that they could be observed at their present location, and Stout suggested that they go to a more private place. Defendants then took Hudson and Peacock to a Melbourne machine shop operated by Stout called Celtic Machine and Welding, Inc. The negotiations were renewed in Stout's office at Celtic and focused on the production of one hundred silencers by defendants for use in South America. Stout and Johnson divulged that they would have to do the work at night to avoid detection by Celtic's employees.

Since their initial meeting Johnson had told the agents that he could take parts and by additional machine work modify semiautomatic weapons to fire fully automatic. Johnson also had represented that he had "contacts" in Atlanta who could provide the needed additional parts. After their meeting at the machine shop, Johnson, Hudson and Peacock returned to the Melbourne airport and flew to Atlanta to meet Johnson's "contacts" and purchase parts for automatic weapons. In Atlanta, the agents accompanied Johnson to a legitimate business trading in firearms and firearm accessories. There agents purchased one *partial* kit for the construction of a silencer and one *partial* "MAC–10 Conversion Kit." [3]

The following day, March 27, 1980, Johnson, Hudson and Peacock returned to Melbourne and went to Stout's machine shop. Johnson and Stout explained to the agents what they would have to do to the parts purchased in Atlanta in order to make a silencer and modify a submachine gun. Stout also showed Hudson and Peacock a combination of parts designed to convert a M–1 carbine into a machine gun. He claimed to have a M–1 carbine but explained that he kept it at another location "in case he got caught." The agents represented that they would like to purchase the M–1 as well as a MAC–10 after the weapons had been modified for automatic firing. An agreement was also reached whereby Johnson and Stout were to make one hundred silencers at a cost of $185 per unit.

Before returning to Miami, the agents purchased the two pistols with attached silencers that they had been shown the previous day. They were allowed to take two additional silencers of different sizes and designs to show their "South American connections." None of the silencers and pistols had identifying serial numbers. In fact, one of the pistols, which had had a serial number the day before, now had its serial number obliterated.

During the next two weeks, there were numerous telephone calls between Johnson and Peacock in which the progress of defendants in making the one hundred silencers and converting semi-automatic weapons was related. Hudson and Peacock again met defendants on April 9 in Melbourne and proceeded to a remote area of Brevard County. Defendants then displayed a M–1, .30 caliber carbine and an Ingram submachine gun (MAC–10) with attached silencer. Both weapons were test fired, and both fired as fully automatic weapons. Defendants had converted the carbine to a machine gun by using the M–2 parts kit that Stout had shown the agents on March 27. The parts kit purchased by the agents and Johnson during their trip to Atlanta had been used by defendants to modify the

---

**3.** According to the testimony at trial partial conversion kits may be lawfully sold because they do not include parts necessary to modify a semi-automatic weapon to fire automatically.

A complete conversion kit or a conversion kit including a receiver for a machine gun is itself a firearm subject to the requirements of Title 26. 26 U.S.C. § 5845(b).

Ingram submachine gun. Only the M–1 carbine was marked with a serial number. Defendants agreed to the immediate sale of the Ingram machine gun and silencers, but Stout refused to transfer the carbine until he could eliminate its serial number. Hudson and Peacock purchased the Ingram machine gun and silencer and returned to Miami.

Arrangements were made by phone for the transfer of the one hundred silencers and the converted M–1 carbine to Hudson and Peacock at the Melbourne airport on April 22, 1980. When defendants arrived at the airport and attempted to complete delivery, they were placed under arrest by federal agents of the BATF. In defendants possession were the modified M–1 carbine and one hundred .22 caliber silencers. A search warrant was later executed on Stout's machine shop, and many of the items seized in the search were related to the silencers confiscated at the airport.

On this appeal, defendants challenge their convictions for their involvement in the occurrences set out above, claiming that: (1) the district judge allowed incompetent and highly prejudicial evidence to be introduced; (2) crucial material evidence, proffered by the defense, was improperly excluded; (3) the prosecution injected prejudicial evidence into the case thereby precluding a fair trial; (4) the evidence was insufficient to sustain a conviction on each of the counts; and (5) in the case of Johnson, the evidence showed entrapment as a matter of law.

## II

Both Johnson and Stout challenge the government's introduction into evidence of two self-authenticating documents[4] from the Department of Treasury, Bureau of Alcohol, Tobacco and Firearms, which were proffered pursuant to Fed.R.Evid. 803(10). That rule sets forth a hearsay exception for evidence introduced "[t]o prove the absence of a record ... or the nonoccurrence or nonexistence of a matter of which a record ... was regularly made and preserved by a public office or agency...." The documents introduced by the government declared that the National Firearms Registration and Transfer Record[5] had been searched, and no evidence was found that

*[any firearms or any silencers were] registered to, or [had] been acquired by lawful making, transfer or importation by* CHARLES ALLEN STOUT [or JOHN MARK JOHNSON] or that CHARLES ALLEN STOUT [or JOHN MARK JOHNSON] had made application to make or transfer said firearms or had paid the making or transfer tax on said firearms or has identified said firearms with a serial number assigned by the Secretary of the Treasury as required by Sections 5811, 5812, 5821, 5822 and 5842, Chapter 53, Title 26 U.S.C. [emphasis added].[6]

At the time the certificates were offered into evidence, defendants objected to their introduction on the basis that "everything in the affidavit[s] ..., which did not pertain to registration or lack of registration, was hearsay." The government, by supplemental brief requested by this court after oral argument, now concedes that as to portions of the certifications, the NFRTR custodian exceeded her competence. First, a search of the firearms registry would not allow certification that neither Johnson nor Stout "had made application to make or transfer firearms." The National Firearms Registration and Transfer Record is alphabetized by the name of the person *entitled* to possession of the firearm, whether that person is a manufacturer, importer,

---

**4.** The documents were certified pursuant to Fed.R.Evid. 902(4). Government Exhibit No. 57 dealt with a search of the firearms registry for "any silencers or any firearms" registered to defendant Stout. Government Exhibit No. 58 was identical in all respects except that it related to defendant Johnson.

**5.** The National Firearms Registration and Transfer Record (NFRTR) is a central registry

maintained by the Secretary of the Treasury "of all firearms in the United States which are not in the possession or under the control of the United States." 26 U.S.C. § 5841.

**6.** The italicized lines of the quotation were part of the standard BATF printed form used for record certifications. The remaining portion had been typed in by the certifying officer.

maker or transferee of the firearm. Only approval by the Bureau of Alcohol, Tobacco and Firearms of the appropriate application to make, transfer, or import a firearm effectuates registration in the record. *See* 27 C.F.R. §§ 179.71; 179.86 (1981). Pending applications to make, transfer or import firearms, therefore, are not part of NFRTR.

The custodian of the registry also could not certify that neither defendant had paid a making tax or transfer tax. Payment of the making tax or transfer tax is represented by an adhesive stamp of the proper denomination, and properly cancelled, affixed to the appropriate application for registration. 27 C.F.R. §§ 179.62; 179.84 (1981). "National Firearms Act Stamps" are purchased from District Director of the Internal Revenue Service "in the collection district in which the stamps are to be used. . . ." and not from the Bureau of Alcohol, Tobacco and Firearms. 27 C.F.R. § 179.161 (1981). No record that a stamp has been purchased would be contained in the NFRTR until an approved application with the stamp affixed was filed in the registry. Therefore, only if the tax were first "paid" when an application was approved, would a custodian of the NFRTR be competent to certify that a transfer tax or making tax had *not* been paid. Such an interpretation of 26 U.S.C. §§ 5811(c) and 5821(c), however, would be erroneous.[7] While the applicable statutes and regulations are ambiguous as to precisely when the transfer tax or making tax is "paid,"[8] it is certain that payment is achieved at some point prior to registration of the firearm in the firearms registry. *See United States v. Coleman*, 441 F.2d 1132, 1133 (5th Cir. 1971) (stamp denotes payment of the tax); *Marshall v. United States*, 422 F.2d 185, 192 (5th Cir. 1970) (stamp attached to show tax has been paid).

The final matter certified by the NFRTR custodian, that neither defendant had been assigned serial numbers by the Secretary of the Treasury, was similarly beyond her competence. A firearm must be properly identified in accordance with 27 C.F.R. § 179.102 before registration can be completed, but nonregistration in the NFRTR does not rule out a firearm's proper identification by serial number.

▮ The district court clearly should have struck out all portions of the two NFRTR certifications except those parts dealing with lack of registration. The firearms registry does not constitute, as required by Fed.R.Evid. 803(10), a "regularly made and preserved record" of payment of transfer or making taxes, pending applications for firearms transactions, or assignment of serial numbers. The lower court's error in admitting the evidence does not, however, require reversal of defendants' convictions unless the erroneous ruling adversely affected a substantial right of defendants. Fed.R.Evid. 103(a); *see United States v. Robinson*, 544 F.2d 110 (2d Cir. 1976). As this court stated in *United States v. Stone*, 604 F.2d 922, 926 (5th Cir. 1979):

"When an error is not of constitutional magnitude, it is not grounds for reversing a conviction if the error had no substantial influence, and enough evidence supports the result apart from the phase affected by error. *Kotteakos v. United States*, 328 U.S. 750 [66 S.Ct. 1239, 90 L.Ed. 1557] (1946); *United States v. Rodriguez*, 573 F.2d 330, 334 (5th Cir. 1978).

Having reviewed each count upon which the improperly admitted evidence potentially bore, we conclude that defendants' convictions on Counts 4, 6, 7, 9 and 11 must be reversed. Those counts assert defendants

---

7. The wording of sections 5811(c) and 5821(c) are identical. Both sections provide: "The tax imposed by subsection (a) of this section shall be payable by the stamp prescribed for payment by the secretary."

8. There is support for a claim that payment of the tax is complete upon purchase of the stamp, *see* 26 U.S.C. §§ 5812(a)(2) and 5822(b); *Lauchli v. United States*, 481 F.2d 408, 414 (5th Cir.) *cert. denied*, 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973); *United States v. Clements*, 471 F.2d 1253, 1255 (5th Cir. 1972); at the time the stamp is affixed to an application, *see* 27 C.F.R. § 179.163 (1981); or when the stamp is "cancelled." *See* 27 C.F.R. §§ 179.67 and 179.84. It is not necessary to the disposition of defendants' claim, however, that we pinpoint the time of "payment" of the transfer tax and the making tax.

failed to pay transfer and making taxes. Apart from the inadmissible portions of the two affidavits, defendants' convictions on those counts are supported at most by evidence demonstrating a disposition or intent not to pay the required taxes. This is not enough evidence to prove the essential element of the offense, actual nonpayment.

■ Defendants argue that the trial court's error also requires reversal of their convictions under Count 12 for possessing one hundred silencers not identified by serial numbers in violation of 26 U.S.C. §§ 5842 and 5861(i). Those sections make it unlawful for anyone making a firearm to fail to identify it "by a serial number which may not be readily removed, obliterated, or altered...." Apart from the evidence admitted in error, there is substantial uncontroverted evidence that the silencers, made by defendants and in defendants' possession at the time of their arrest, were not stamped with any identifying markings. Defendants contend, however, that this evidence alone is insufficient to support their convictions because it does negate compliance with the proviso set out in 27 C.F.R. 179.102 (1981), which states:

> Provided, that the Director may authorize other means of identification of the manufacturer, importer, or maker upon receipt of letter application, in duplicate, from the same showing that such other identification is reasonable and will not hinder the effective administration of this part.

Defendants' argument lacks merit. In a prosecution for illegal possession of firearms, the burden of proof is on the government to prove each element of the offense beyond a reasonable doubt. *United States v. Goodson*, 439 F.2d 1056 (5th Cir. 1971). Yet once the government has proven the elements of the offense, the burden shifts to defendants to demonstrate qualification under an exception. *McKelvey v. United States*, 260 U.S. 353, 357, 43 S.Ct. 132, 134, 67 L.Ed. 301 (1922); *United States v. Ramzy*, 446 F.2d 1184 (5th Cir. 1974), *cert. denied*, 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d

544 (1971); *see United States v. Mares*, 208 F.Supp. 550 (D.Col.1902). The government in the instant case undeniably bore its burden as to the essential elements of 26 U.S.C. § 5861(i). It was then up to defendants to show that they had met the requirements of the proviso in 27 C.F.R. 179.102. We conclude, therefore, that defendants' convictions under Count 12 could not have been significantly influenced by the two BATF certifications, and admission of the hearsay portions of those documents was harmless error.

## III

At the close of the government's case, defendants moved to introduce in evidence two exhibits. Defendants' Exhibit No. 7 consisted of six internal memoranda of the Bureau of Alcohol, Tobacco and Firearms. The five oldest memoranda, dated between May 1975 and April 1976, extensively discussed problems with the "Diebold" mechanical filing system then used with the National Firearms Registration and Transfer Record. The sixth memorandum, dated August 20, 1979, restated each of the problems existing under the "Diebold" system and explained how those conditions had been corrected by a manual filing system. The defense offered as a "substitute exhibit," an authenticated copy of the 1979 Senate Oversight Hearings on the Bureau of Alcohol, Tobacco and Firearms, which contained the 1975 and 1976 memoranda but did not include the 1979 evaluation of the firearms registry. The trial court refused to allow either exhibit to go to the jury. Defendants now argue that this ruling constitutes reversible error.

■ A trial court's ruling as to the materiality, relevancy or competency of testimony or exhibits will ordinarily not warrant reversal unless constituting "an abuse of discretion, frought with reasonable likelihood of prejudice to defendant ...." *United States v. Nill*, 518 F.2d 793 (5th Cir. 1975). In the instant case, the trial court's refusal to admit in evidence Defendants' Exhibits No. 7 and No. 8 was not an abuse of discretion.[9] Defendants' two exhibits

---

9. In support of their position defendants cite *United States v. Abascal*, 564 F.2d 821 (9th Cir.

1977). In *Abascal* the Ninth Circuit held that the trial judge improperly excluded certain de-

were of dubious probative value. The 1975 and 1976 BATF internal memoranda discussed conditions existing five to six years before trial, which according to the April 1979 evaluation, had largely been corrected. The Oversight Committee hearings incorporated the five earlier BATF memoranda, but excluded the 1979 update. Additionally, both exhibits contained extensive material that was irrelevant to the questions before the jury, and defendants made no attempt to isolate the relevant parts of the exhibits. Finally, the exhibits were inadmissible hearsay. Defendants attempted to introduce them under the catchall hearsay exception set out in Fed.R.Evid. 803(24). Neither document presents, however, any of the circumstantial guarantees of trustworthiness required for qualification under the Rule. *See United States v. Colson*, 662 F.2d 1389 (11th Cir. 1981).

## IV

The third charge made by defendants is that judgment on all counts must be reversed because of prosecutorial misconduct denying defendants their right to a fair trial. The asserted misconduct was in the form of testimony elicited by the prosecution and comments made to the jury during the government's closing argument. Defendants claim that the prosecution attempted to inject elements of drug trafficking and other foreign crimes into the case by disclosing to the jury the villainous character portrayed by those with whom defendants negotiated the firearms transaction. The prosecution is also alleged to have made repeated attempts to portray

Johnson as an individual of bad character by referring to actions of defendant Johnson that prejudiced him in the minds of the jurors but were irrelevant to the offenses charged.[10] We have reviewed the cited instances of prosecutorial misconduct and conclude that the prosecution's improvidence was not of a sufficient magnitude to justify reversal of defendants' convictions.

■ As part of the basis for mistrial defendants cite testimony and comments to which no timely objection was made. When there is a failure to timely object, a plain error standard should be applied in order to "promote efficient judicial administration and to prevent parties from gambling for favorable verdicts and then resorting to appeal on errors that might have easily been corrected by objection at trial." *United States v. Brown*, 548 F.2d 1194, 1207 (5th Cir. 1977); *see* Fed.R.Crim.P. 52(b). This court has described plain errors as "[errors] involving serious deficiencies which affect the fairness, integrity, or public reputation of the judicial proceedings or which constitute obvious error." 548 F.2d at 1207. Application of this standard necessarily requires consideration of all circumstances at trial including the strength of the evidence against defendants. *United States v. Greene*, 578 F.2d 648, 654 (5th Cir. 1978); *see United States v. Rhoden*, 453 F.2d 598, 600 (5th Cir. 1972).

■ Throughout the trial the prosecution brought out testimony that undercover agents Peacock and Hudson were posing as "criminals." Additionally, in its closing argument the prosecution twice referred to

fense exhibits. The court then determined that the error denied defendant his right to present an important part of his defense and was therefore prejudicial. We conclude above that in the instant case the trial court's exclusion of defendants' exhibits was not in error. But even if it were, we could discern no conceivable prejudice to defendants. The most recent BATF memorandum speaks for the accuracy of the NFRTR, and the problems remaining with the registry could not have affected the accuracy of a search for defendants' registration. To the extent the two exhibits were offered to support defendants' claim that firearms intended for export do not have to be registered, we

note that that legal theory is based on an erroneous interpretation of the relevant statutes. (See Section V of this opinion.) Furthermore, the BATF memoranda actually contradict defendants' position by strongly indicating that even firearms to be exported must be registered and that the registration is continued until proof of exportation is received.

**10.** Defendant Stout claims that the prejudice created by these references spilled over and tainted him. We find it unnecessary to address the validity of this spill over theory in light of our conclusion that even as to defendant Johnson the comments do not require reversal.

the informant, Albert Willis, as "unsavory,"[11] commented that defendant Johnson had "all the connections," and remarked: "A lot of people don't have much but they are not selling machine guns and silencers on the streets." None of these comments were objected to at the time they were made. Therefore, even if improper, this conduct does not meet the plain error standard—i.e. the references clearly did not affect defendants' substantial rights. Johnson's defense counsel, apparently attempting to support a claim of entrapment, also had elicited testimony indicating the "criminal" character portrayed by the undercover agents. The prosecutor's comments on Willis' "unsavory" character, although of doubtful relevance, were based on testimony given by defendant Johnson on direct examination. *See also Alvarez v. Estelle*, 531 F.2d 1319 (5th Cir. 1976). The statement that Johnson had "all the connections" must be understood in the context of the testimony heard by the jury that the only "connections" that Johnson had were perfectly legitimate sources of firearms and accessories. Finally, the reference to Johnson selling guns on the street, while inflammatory, was not of the type that this court has previously held to be fundamentally prejudicial. We further note that no repetition of the remark occurred. *See United States v. McRae*, 593 F.2d 700, 706 (5th Cir. 1979).

■ On several occasions the prosecution elicited testimony to which defendants immediately objected. In every case except those discussed below, the objection was sustained by the trial judge and an immediate cautionary instruction was given to the jury. Assuming arguendo the prosecution erred in eliciting the testimony, substantive prejudice to defendant does not appear and what prejudice might have been provoked was cured by the court's immediate cautionary instruction. *United States v. Hughes*, 658 F.2d 317 (5th Cir. 1981).

During the course of the trial the prosecution made four references to the undercover officials' representations to Johnson that the firearms would be exchanged in South America for narcotics. The first two times narcotics were mentioned came during the government's case in chief. After the first references to narcotics, defendants' objections were sustained and the jury given a cautionary instruction. Later the prosecution while questioning Agent Hudson about the specifics of the "front," evoked the following testimony and discussion with the court:

HUDSON: Mr. Peacock and I [alluded to] the fact that we had contacts in South America, that we wanted large quantities of weapons to take to South America.

THE PROSECUTION: Did you tell him for what purpose?

A  Yes.

Q  What purpose was that?

A  To exchange for narcotics.

COUNSEL FOR DEFENDANT STOUT: I am going to object and move for mistrial.

THE COURT: Counsel, that's not relevant, is it, to any element of the offense?

THE PROSECUTION: I would like to approach the Bench on that.

THE COURT: All right.

(At the Bench.)

THE COURT: I don't think that's relevant.

---

11. We acknowledge that in *Hall v. United States*, 419 F.2d 582 (5th Cir. 1969), this court held that the trial court on its own motion should have instructed the jury to disregard the prosecution's reference to defendant as a "hoodlum." Defendants cite *Hall* for the proposition that reference to the government's informant as "unsavory" prejudiced defendant Johnson to such an extent that immediate objection by defense counsel was unnecessary. In *Hall* we condemned "shorthand character-

izations of an *accused* not based on evidence." [Emphasis added] *Id.* at 587. Similar references to an acquaintance of a defendant are also improper and should not be injected by the prosecution. *See United States v. Blalock*, 564 F.2d 1180 (5th Cir. 1977). The prejudicial impact on a defendant of such comments is, however, inherently indirect, and under all circumstances of the instant case, the trial judge was not required to issue cautionary instructions absent an objection by defendants.

THE PROSECUTION: In Mr. Steven's opening statement he said that he appealed to the man's sympathy, his emotions, his patriotism to get him to do this and this is—

THE COURT: I'm going to restrict you to the relevant evidence in the government's case in chief and if there is something appropriate by way of rebuttal, then we will know better what it is.

Sustain the objection.

(In open Court.)

THE COURT: The last comment of the witness to the effect he desired to have the weapon to trade in South America for narcotics is stricken. The Jury is instructed to disregard it.

No further mention of narcotics was made until after the defense began presentation of its case. On direct examination Johnson had testified that Hudson and Peacock told him the weapons would be used to fight communists in South America. The prosecution on cross examination questioned Johnson on whether he had also been told that Hudson and Peacock were "cocaine dealers" and "cocaine cowboys." Defense counsel's objection to this questioning was overruled.

■ We agree with the trial court that, following Johnson's testimony on direct examination, the prosecution's questioning concerning the represented character of Hudson and Peacock was proper rebuttal. We are convinced that the prosecution was not attempting to elicit irrelevant, prejudicial testimony but was merely seeking to rebut defendant Johnson's claim of entrapment. *See United States v. Freeman,* 660 F.2d 1030 (5th Cir. 1981); *United States v. Tasto,* 586 F.2d 1068 (5th Cir. 1978); *United States v. Aloi,* 511 F.2d 585 (2d Cir. 1975).

■ As a fall back position defendant Stout, citing *United States v. LaBarbera,* 581 F.2d 107 (5th Cir. 1978), argues that the cumulative impact of all the prosecution's improper comments mandates reversal. In *LaBarbera* the court was faced with numerous errors of the most aggregious type— e.g. references to extra-record evidence and comments indicating the prosecution's knowledge of defendant's guilt of other crimes. The improper comments by the prosecution in the instant case, either separately or cumulatively, simply are not of the same magnitude as those presented in *LaBarbera.*

## V

■ The remaining arguments raised by defendants do not warrant extensive discussion. Defendants base a challenge to their convictions for possessing unregistered firearms, conspiring to violate federal firearm laws, and possessing firearms not identified by serial numbers on the unique theory that the registration and serial number identification requirements of Title 26 do not apply to firearms intended for export. This reading of sections 5842 and 5841(e) requires a complete disregard of the plain meaning of those statutes. Both provisions clearly apply to all firearms acquired by making, importation or transfer as long as in the United States regardless of their destination.

■ Defendants' challenge to the sufficiency of the evidence on their convictions for possessing a firearm that had its serial number obliterated is also without merit. The evidence is undisputed that defendants were in possession of a M–1 rifle that had been converted to a fully automatic weapon and which, when first seen by undercover officers Hudson and Peacock, was stamped with a serial number. At the time of defendants' arrests the serial number had been obliterated. This evidence unquestionably meets the sufficiency of the evidence standards previously set out by this court. *See United States v. Rodriguez,* 654 F.2d 315 (5th Cir. 1981); *United States v. Kelley,* 630 F.2d 302 (5th Cir. 1980). Finally, the government met its burden of rebutting the entrapment defense of Johnson by competent evidence of the defendant's own conduct. *See United States v. Bradsby,* 628 F.2d 901 (5th Cir. 1980); *United States v. Williams,* 613 F.2d 560, 562 (5th Cir. 1980).

We have reviewed defendants' remaining arguments and find them frivolous.

The convictions are accordingly AFFIRMED IN PART and REVERSED IN PART.