**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Harold D. JOHNS, Defendant-Appellant.**

No. 82–3212.

United States Court of Appeals,
Eleventh Circuit.

June 18, 1984.

Michael Smith, John F. Evans, Coral Gables, Fla., for defendant-appellant.

William B. King, Warren A. Zimmerman, Asst. U.S. Attys., Tampa, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJOFLAT and HENDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Harold Johns was indicted and brought to trial after he and a friend attempted to fly three hundred pounds of cocaine into the United States. A jury convicted him of knowing importation of cocaine, possession of cocaine with intent to distribute, and conspiracies to commit those offenses. He now appeals his convictions. We affirm.

I.

On the night of December 13, 1981, radar operators at Tyndall Air Force Base in the Florida panhandle picked up an unidentified aircraft approaching the Air Defense Identification Zone (ADIZ). Since Air Force personnel could not identify the plane, two fighter planes were sent to intercept it. In addition, a U.S. Customs Service aircraft was sent to track the

plane. It was equipped with radar and a Forward Looking Infra-Red (FLIR) System.[1]

When the Customs plane began to follow the target plane, the Air Force ground radar continued to monitor the target plane, coordinating the surveillance with two other ground radar operators at various Florida locations, one of whom also monitored the chase on a "height finder" radar unit.[2] The Customs aircraft followed the suspect plane, often within a distance of one to three miles, until it landed at Tampa International Airport (TIA). Its task was made more difficult because the suspect plane had no lights or transponder. While the various radar operators "lost" the suspect aircraft on occasion during the chase, the aircraft was continuously on the "height finder" screen and was always "found" quickly. Each time, the FLIR equipment, which could sense some physical features of the plane such as exhaust, wing, and tail formation, showed the "found" plane to have the same features as the suspect plane.

During the chase, the FLIR operator twice noticed objects being jettisoned from the suspect craft. Each time he noted the geographical coordinates. The first time, he saw seven objects drop, one of which appeared to be spewing out smoke. The second time, he saw seven more objects drop. The FLIR image of the smoking object, he testified, could have represented a fuel bladder detached and trailing a stream of fuel; the fuel would have dispersed in a pattern similar to smoke as the bladder plummeted to the ground. Between the second drop point and the landing, radar operators only lost the plane for one brief moment, after TIA traffic control-lers had already spoken with the plane's pilot.

During the week after the drop, area residents around the two drop points with coordinates noted by the FLIR operator found nine duffel bags of identical material and size filled with cocaine. A fuel bladder was not found.

When the suspect plane, a Cessna Conquest, landed at TIA, Jim Coley was piloting it, and Harold Johns, the appellant, was in the passenger seat. The back of the plane was empty; the seats had been removed. An open valve in the back cabin floor, suitable for attaching a fuel bladder, had leaked a large amount of fuel all over the cabin carpet. No trace of cocaine was found in the airplane, however.

Coley and Johns were arrested and indicted; Coley thereafter became a fugitive. At Johns' trial the prosecutor established the facts we have related. Johns' theory of defense was that the tracking team had lost the suspect plane and picked up his plane in the course of the chase. Johns testified that on the afternoon of December 13, he and Coley had flown from Miami to visit a friend, Jack Bryant, an ex-county commissioner in Cairo, Georgia. They had brought Bryant two hang gliders; in order to fit the gliders in the plane they had taken out the back seats. When they got back in the plane to return to Miami, they noticed a battery problem and were forced to travel without the plane's lights and transponder. Bryant corroborated this alibi and the battery problem.

Johns called several experts to support his theory that the Customs-Air Force tracking team had lost the suspect plane and picked up his by mistake. One defense

1. The FLIR System, initially designed for use in warfare, operates on a heat-sensor principle allowing its operator to observe objects which normally cannot be seen by the human eye in darkness. The system aboard the Customs aircraft allowed the air officers to observe on a television-like screen objects with varying degrees of clarity depending on numerous factors. The radar surveillance system and the FLIR are integrated and have the capability to "lock on" to a target. The "lock on" capability is comput-er based and results in the elimination of other objects on the aircraft's radar scope. The system, however, can "lose" a target.

2. The "height finder" unit nods up and down and reflects the altitude and range of an aircraft. It can, for example, distinguish multiple aircraft which might be flying in a "piggyback" formation. The height finder can be directed to a target manually or automatically.

expert testified that a "switch" could have occurred, where the radar operators lost the smuggling plane and "locked on" to Johns' and Coley's craft. Another defense expert testified that Johns' plane's doors could not have been opened in flight if the cabin had been pressurized, or at high speeds. A third testified that the cocaine, if dropped, would have smashed into the plane's tail and damaged it. The defense, in the absence of the jury, proffered the testimony of an expert in voice stress analysis that the voice of Harold Johns, speaking to the TIA tower was not stressed, while that of the Customs pilot was, implying that the Customs information was inaccurate and that Johns was too calm to have been in a cocaine smuggling chase. The government objected on the ground that the testimony was not in the scope of the witness' expertise and would not be helpful to the jury. The trial judge rejected the proffered testimony partly because he found the predicate regarding scientific ac-

ceptability of such opinion evidence to be inadequate.

In rebuttal, the prosecutor put on a Cessna flight test engineer to testify that the doors to Johns' plane could have been opened and the cargo jettisoned without damage to plane or passengers. Both sides then presented closing argument, and, after the court's charge, the jury convicted Johns on all counts.

On appeal, Johns alleges numerous instances of prosecutorial misconduct. He also challenges the trial judge's exclusion of his voice stress expert's testimony, alleges a defect in the wording of the indictment, and challenges the judge's determination that three photographs which mistakenly went to the jury did not warrant a new trial. Only the prosecutorial misconduct claim warrants discussion here.[3]

## II.

Johns alleges multiple incidents of prosecutorial misconduct. Most of the allegedly

---

**3.** Johns alleges the conspiracy count of the indictment was defective because it charged that he and Coley "did wilfully and knowingly combine, conspire, and confederate and agree with others unknown ..." and he was convicted of conspiring with Coley. He argues that the omission of the word "together" is fatal to his conviction. Indictments are read for their clear meaning and a conviction should not be overturned because of a minor deficiency not prejudicing the accused. *United States v. Gordon,* 638 F.2d 886, 889 (5th Cir. Unit B) *cert. denied,* 452 U.S. 909, 101 S.Ct. 3038, 69 L.Ed.2d 411 (1981). The test for sufficiency of an indictment is "whether it states the elements of the offense intended to be charged and adequately apprises the defendant of that which he must be prepared to meet." *United States v. Contris,* 592 F.2d 893, 896 (5th Cir.1979). The conspiracy was adequately set forth; there was no prejudice to Johns.

Whether to exclude the "voice stress" testimony was within the broad discretion of the district judge; we must sustain his decision unless it was manifestly erroneous. *United States v. Costa,* 691 F.2d 1358, 1361 (11th Cir.1982). The tape of the TIA tower-Johns plane conversation went to the jury. The judge was apparently concerned with the ability of the witness to analyze stress in voices he had never heard and, also, the lack of predicate showing that the testimony would have probative value, including the witness' never having testified to voice stress in court before. We find no manifest error in the exclusion of the testimony.

Finally, the three photographs that mistakenly went to the jury were innocuous and untitled pictures of the ranch next to Johns' property owned by a Frank Brady. *See infra* text, section II.A. Upon finding that the photographs had gone to the jury, the judge sent the following instruction:

It has now been determined after discussing the matter with all counsel that the photographs in question were offered and received in evidence through inadvertence and mistake, have nothing to do with the defendant or this case, and have been withdrawn from the evidence. You are instructed to disregard them entirely.

While the defense requested that the instruction also state that the photographs had nothing to do with Coley, when that request was denied the defense made no other request or motion for a mistrial. The instruction to the jury was adequate to remove any possible prejudice; given the nature of the photographs none likely was created at all. Johns argues that the jury's reaching a verdict 17 minutes after the instruction was given shows prejudice. It is more likely that the jury had tentatively reached a decision but wanted to be sure the photos did not contradict that decision before they signed the verdict form. Reversal is not required under the circumstances. *See United States v. Burket,* 480 F.2d 568 (2d Cir.1973).

improper actions occurred in the prosecutor's closing argument and the defense made no timely objection to them. The defense also asserts six instances where the prosecutor, in questioning witnesses, pursued improper lines of examination. One of these was objected to and prompted curative action by the trial judge. Two others were timely objected to, and the objections were denied. The defense made no objection to the final three alleged errors.[4]

■ Prosecutorial misconduct only constitutes a ground for reversal if, viewed in the context of the entire trial, it may have

---

4. Johns asserts that his counsel did object to one alleged instance of misconduct we treat in this group, namely, the cross-examination of the defendant regarding some testimony he had given at a pretrial bail hearing. The objection made at trial was different from that argued on appeal, however.

In the "bail cross" incident, the prosecutor was seeking to show that Johns' alibi had been recently fabricated. In so doing, he sought to show that testimony Johns had given at a pretrial bail hearing was inconsistent with his having an alibi at that time. At trial, the prosecutor asked Johns whether he was aware of his alibi at the time of his bail hearing. Defense counsel asked for a sidebar to prevent the prosecutor from bringing out that Coley, an obvious alibi witness was a fugitive:

MR. RACHLIN [defense counsel]: Okay. But I feel the inquiry may get into the situation where—why didn't he bring Coley into the situation? And the only explanation is because he's not around. And I think that would be prejudicial, and the jury shouldn't hear that. That's why the inquiry is made. That's the reason I'm making this objection.
The court cautioned the prosecutor:

THE COURT: Well, be careful with your questioning, Mr. King. Whether or not Mr. Coley is a fugitive is not relevant here. The efforts made by this witness to find him or other witnesses to support what has become in the nature of an alibi defense I think is relevant. But you'll have to observe the distinction between those two circumstances.
The prosecutor then attacked Johns' alibi defense as follows, with no objection by the defense to the attack.

Q Now, Mr. Johns, when was the last time that you saw Jim Coley?
A Around the end of February.
Q Before your arrest; is that correct?
A Yes.
Q How many times had you seen Coley between December 13th and February 26th [1982], the date of your arrest?
A I imagine I saw him quite a few times....
Q Um-hmm. Now, Jim Coley, of course, is the third person—
A That's correct.
Q —besides you and Mr. Bryant; correct?
A That's correct.
Q So you would have wanted to make every effort to contact Jim Coley from February 26 on to support your alibi defense; is that right?
A That's correct....
Q But Jim Coley was the one that you would have wanted to have to support your alibi; isn't that right?
A Yes, sir. That would make it much better.
Q That's right. The same man who is charged in the indictment here with you today; right?
A That's correct.
Q I mean, the two of you giving this alibi defense would be much more supportive than just you and Mr. Bryant; right?
A Yes, sir, that's true.
Q And surely, that's what he would say; right?—Jim Coley?
A Yes. Yes, I'm sure he would say it.
Q And at the time—oh, let's say in April of 1982—you would have wanted to contact Mr. Coley to support your alibi defense; right?
A Yes.
Q You would have made every effort to do that; isn't that right?
A Yes.... [The prosecutor then read Johns' prior statement from a bail hearing that he "didn't care" where Coley was at the time.]
Q The reason you didn't care where Jim Coley was, was because you knew that Jim Coley would never support your alibi defense that you've testified to here today and that Mr. Bryant testified to here yesterday, and because you knew that Jim Coley could not support you, because you and Jim Coley flew from Colombia on December 13th, 1981, to the United States where you landed on the morning of December 14th, 1982 [sic]. That's why you didn't care where Jim Coley was then and that's why you don't care where he has ever been since the time of your arrest?
A Is that a question?
Q Yes
A There's nothing at all true about that statement.
Thus, defense counsel, in making the objection we have quoted above, apparently was concerned only that Coley's fugitive status not come out. He gave the trial judge no opportunity to correct the prejudice he now alleges was caused by the prosecutor's attack on the alibi; thus, the attack should be judged by "plain error" standards. *See* Fed.R.Crim.P. 52.

prejudiced substantial rights of the defendant. *United States v. Bosby*, 675 F.2d 1174, 1185 (11th Cir.1982); *United States v. Davis*, 546 F.2d 583, 593 (5th Cir.) *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). If no objection is timely made, the prosecutorial conduct must constitute plain error under Fed.R.Crim.P. 52(b), or a "defect affecting substantial rights" of the accused. Application of this standard requires consideration of all circumstances at trial, including the strength of the evidence against Johns. *United States v. Stout*, 667 F.2d 1347, 1354 (11th Cir.1982).

We have read the record of the trial and find no pattern of misconduct prejudicing the defendant's substantial rights. Nor were the isolated instances challenged here sufficient to constitute reversible misconduct. The conduct preserved for appeal was not such error; the rest was not plain error.

### A.

█ The conduct to which the defense objected, and for which the judge gave a curative instruction, does not require us to reverse Johns' convictions. Defense counsel cross-examined a sheriff extensively about local airstrip owners near some property Johns owned which also contained an airstrip. Counsel sought to show that Johns' owning an airstrip was perfectly normal in that area and did not show him to be a drug smuggler. In the course of the examination he asked several questions about the airstrip on the Brady ranch next door to Johns' property. The prosecutor, on redirect, asked the sheriff "Who is Frank Brady?" The witness responded that he was a suspected drug smuggler. The defense objected, moved to strike the comment and moved for a mistrial. The judge instructed the jury to disregard the question and answer. We find no error in the judge's action for two reasons: the instruction was sufficient to cure any harm, *see United States v. Capo*, 693 F.2d 1330 (11th Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1793, 76 L.Ed.2d 359 (1983)

and the question was invited by the defense examination of the witness.

### B.

█ The two instances of conduct to which defense counsel objected that were not promptly cured by the trial judge were as follows. First, the prosecutor asked the defendant:

Q When was your first discussion with Mr. Bryant, who testified here yesterday, about him appearing for you?

A It was in early—early '82, after I was arrested.

Q That was when you were arrested on the federal charges; is that right?

A That's correct.

Q What was the bond that was set on those charges?

MR. RACHLIN: Objection, Your Honor. May I approach the bench?

THE COURT: Well, I'll sustain the objection. I see no need for a bench conference.

A bench conference was conducted, however; there defense counsel urged that the question on the federal charges prejudiced the defendant because it implied other charges existed. The court, mainly concerned with the relevance of the bond, sustained "the objection to that" (apparently relevance of the bond). Defense counsel requested no further action by the court, such as a curative instruction or a mistrial.

The impact of that question on the jury was minimal in the context of the trial. No other evidence, argument or examination referred to any other charges. It is highly unlikely that the jury would have inferred from the prosecutor's question that any other charges were pending against Johns, or that any fact presented to them was more or less true because of it. The question could not have prejudiced the substantial rights of the accused.

█ On the second occasion, the defense attorney was seeking to establish that the DEA investigation tying Johns to the cocaine in this case was inconclusive. He elicited testimony on cross-examination of

DEA Agent South that South had stated in a report filed at the beginning of the investigation that he was not sure at that time whether the cocaine had been dropped from Johns' aircraft. The prosecutor on redirect examination sought to establish that the report had been written before most of the investigatory work had been done and thus did not reflect any inconclusiveness in the investigation. The colloquy was:

Q Agent South, since the time of your initial report and your initial contact with this case in which you indicated that the cocaine *may have come* from [Johns'] aircraft, did you then have an occasion thereafter to complete your investigation into this matter resulting in the charges that were brought here *and resulting ultimately in the trial here this week?*

A Have I formed an opinion?

Q No. Did you have an opportunity to complete your investigation from that point on *which resulted in charges and ultimately in the trial here today?*

A The investigation is continuing from the standpoint of the Drug Enforcement Administration.

(emphasis added). Plainly the prosecutor did not seek the status of the investigation outside the trial, but rather only the investigation leading up to the trial. The answer was unresponsive. Johns' counsel sought *no* curative instruction; he only moved for a mistrial. A mistrial certainly was not warranted. The prosecutor is not guilty of misconduct when he unexpectedly receives a nonresponsive answer to an innocent question.

### C.

The conduct Johns contends amounted to plain error was the prosecutor's cross-examination of the defense alibi witness, Jack Bryant, regarding Bryant's failure to come forward sooner, and the prosecutor's cross-examination of Johns regarding, first, Johns' attitude toward police officers' venturing onto his property, and second, Johns' failure to seek out Coley as an alibi witness. In addition, Johns argues, the prosecutor used many impermissible arguments in his summation to the jury.

### 1.

The prosecutor's closing argument was within the bounds of permissible argument. We have described counsel's role in summation as follows:

The purpose of summations is for the attorneys to assist the jury in analyzing, evaluating, and applying *the evidence* .... The assistance permitted includes counsel's right to state his contention as to the conclusions that the jury should draw from the evidence. Therefore, an attorney's statements that indicate his opinion or knowledge of the case as theretofore presented before the court and jury are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence.

*United States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978). The prosecutor kept his argument within these boundaries.

For the most part, all the arguments Johns now challenges were inferences arising directly from the evidence produced at trial. The "facts not in evidence" argued by the prosecutor were not facts, but rather inferences fairly suggested by the evidence or by matters of common knowledge outside the evidence. The low credibility the prosecutor suggested the jury accord the defense experts' testimony and the alibi testimony arose from the evidence. The prosecutor did not place the credibility of his office behind his own witnesses. At most he merely attempted to rebut aspersions the defense had cast on those witnesses; he pointed out features of their own testimony that supported their credibility. He did not express personal opinions about the witnesses. Rather, he urged the jury to draw inferences and conclusions from the evidence produced at trial. *See United States v. Marcello,* 423 F.2d 993, 1009–1010 (5th Cir.), *cert. denied,* 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970).

**2.**

█ The prosecutor implied, improperly Johns contends, that if Bryant were an upstanding citizen who could corroborate Johns' alibi he would have come forward long before the trial, which took place in October 1982, in an effort to clear Johns. For example, he could have gotten in touch with people he knew in law enforcement in Georgia when he was a county commissioner. On cross-examination, Bryant testified that Johns had told him about the indictment in March 1982, shortly after his arrest, and had stated that "if he needed me he would get back to me." He also testified that he had some friends in law enforcement in Georgia. In closing, the prosecutor argued that if the alibi were true:

> don't you think that Commissioner Bryant, with all his friends in law enforcement, would have picked up the telephone—would have picked up the telephone and called someone like a Drug Enforcement Administration, like the U.S. Attorney's office, like all his friends up there, to say, "Hey, you've got the wrong guy. Let me tell you about this. He was up here with me. I'll come down there and, you know, I'll tell anybody that you want...." That's what you would have expected of a commissioner, of an upstanding citizen, and of a person who would have thought enough of himself to think that others like the Government would believe him and would at least investigate what he would have to tell 'em.

In determining whether the trial judge's admission of the evidence regarding Bryant's failure to get in touch with law enforcement, and the argument thereon, was appropriate, we return to the basic principles governing admissibility of evidence. Finding that this evidence was admissible under established criteria, we then evaluate whether any policy reasons existed for the exclusion of such evidence, in the abstract or in this case.

First we note that the prosecutor's line of inquiry was clearly relevant and thus admissible under Fed.R.Evid. 401. That anyone, defendant or witness, fails to present a defendant's alibi to law enforcement at the earliest time possible has some logical negative reflection on the credibility of the alibi defense.

Johns argues in essence that we should not approve the line of inquiry because it did not meet the additional criteria for admissibility expressed in Fed.R.Evid. 403. He argues that the probative value of such evidence is slim because the logical connection between a witness' failure to come forward and the likelihood that the alibi is fabricated is minimal. A defense witness, he notes, might have many reasons for failing to come forward, such as instructions by defense lawyers not to come forward, lack of acquaintance with law enforcement officers, or physical remoteness from the investigation site. Accordingly, Johns asserts, the likelihood of confusing the jury, wasting judicial resources, and prejudicing the defendant would of necessity outweigh the probative value of such evidence.

We are unwilling to establish regarding the rule 403 inquiry a per se rule that the probative value of such evidence will always be outweighed by other considerations. Rather, the evidence should be weighed in the context of each case by the trial judge. The judge can take into account the relevant factors, including the strength of the alibi, the witness' proximity to the investigation, how soon the witness finds out about the arrest, and what steps were available to him. He may conduct such an inquiry outside the presence of the jury, if necessary. The judge may also hear the extent to which the witness may explain his failure to present the information earlier. Then, the judge can determine whether the probative value of the evidence in that case is sufficiently outweighed by prejudice to the defendant, likelihood of confusing the jury, or waste of time that the evidence should not be presented.

The question next becomes whether for some policy reasons we should not allow the prosecutor to present otherwise admis-

sible evidence to the jury. For example, when a defendant does not tell police his alibi, we prohibit such argument for *Miranda* reasons. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). We find no similar policy that would prevent our allowing the prosecutor to attack an alibi witness' credibility by pointing out that he did not come forward until trial.

On the facts of this case, the judge did not abuse his discretion in admitting the evidence regarding Bryant's failure to come forward, or in permitting argument of that evidence to the jury. The probative value of the evidence was high; the prosecutor brought out on cross-examination that Bryant did in fact have friends in law enforcement and that he did nothing during the six months after Johns told him of the arrest. Argument that on these facts Bryant's credibility was weakened by his failure to come forward was not misconduct.

### 3.

■ The prosecutor's cross-examination of Johns regarding whether he welcomed police on his property was proper in this case. Johns had affirmatively portrayed himself on direct examination as a friend of law enforcement who always welcomed police on his property. In particular, he asserted that one officer, Officer Murphy, had "always been welcome." On cross, the prosecutor merely tested those statements. The cross-examination did not, as appellant asserts, amount to an attempt to demonstrate a post-arrest silence by the defend-

ant as condemned by *Doyle v. Ohio, supra,* nor did it have such an effect.

### 4.

Johns argues that the prosecutor's cross-examination of Johns [5] and closing argument strongly implied to the jury that Johns had not called Coley to the stand because his testimony would have been unfavorable. The prosecutor in closing argument, while never affirmatively stating that Coley's testimony at trial would have been unfavorable to Johns, emphasized Coley's absence to the jury, stating "you had better believe that [the defense] would want Jim Coley around as their alibi witness if that were the case. But if [he] has this stuff on his hands, and he's dirty ... you'd better believe they'll try to keep him away from [Johns]."

■ There is law in this circuit that the prosecutor may not argue to the jury that a witness' absence means that he would testify in a manner unfavorable to the defense unless the witness is within the defendant's control. *United States v. Chapman*, 435 F.2d 1245 (5th Cir.1970), *cert. denied*, 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971); *United States v. Herberman*, ±583 F.2d 222, 230 (5th Cir.1978). The question here is, first, whether the prosecutor made such an argument, and second, whether that argument constituted plain error.[6] In this instance we find that the prosecutor did overstep the bounds of proper argument, but we do not find the deviation to have affected the substantial rights of the

---

5. *See supra* note 4.

6. In evaluating the argument for plain error we take into account factors that may have made the error harmless; we look at the error in the context of the entire trial, including the strength of the evidence against the accused, *United States v. Stout*, 667 F.2d 1347, 1354–55 (11th Cir.1982), to determine whether the error "affected the substantial rights" of the accused. This is unlike the reversible error inquiry. There, the inquiry can have two distinct steps. If we determine that a properly preserved error "may have affected" the substantial rights of the accused, we have further an obligation to determine whether the error in fact was harmless in the particular case. *See United States v. Has-*

*ting,* 461 U.S. 499, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). If so, we must not reverse the conviction. *Id.* (Naturally we may also affirm on the harmless error ground without discussing the error itself.)

In contrast, it would be inconsistent with the definition of "plain error" and "harmless error" to determine that plain error existed but was harmless in the particular case. Such an analysis would *assert* that the alleged error "affected substantial rights" but then "did not affect substantial rights." Compare Fed.R.Crim.P. 52(a) with Fed.R.Crim.P. 52(b). *See also* 3A C. Wright, Federal Practice and Procedure, Criminal 2d §§ 851–856 and § 856 n. 26 (1982).

accused within the meaning of the plain error rule, Fed.R.Crim.P. 52(b).

[redacted] We note, first, that for the most part the prosecutor, in questioning Johns about his contact with Coley, pursued a proper objective. His theory of the case was that Johns' alibi was recently fabricated. When he asked Johns about Johns' own past conduct which was inconsistent with his having an alibi at the time of his arrest, he brought relevant and probative evidence before the jury.

The prosecutor overstepped these bounds when, in argument, he asserted to the jury that "you had better believe that [the defense] would want Jim Coley around as their alibi witness if that were the case." This statement focused the jury's attention on where Coley might be at the present time, rather than on whether Johns had, in the past, acted consistently with his having an alibi. It implied strongly to the jury that Coley was not at trial because his testimony would be unfavorable.

Since Coley was not a witness in the defense's control, but rather was a fugitive, the prosecutor was not entitled to raise for the jury the inference that Coley's testimony at trial would not corroborate the alibi. In this case such an inference was particularly unfair because Johns could only explain away the inference by informing the jury that Coley was not present because he was a fugitive, a piece of evidence that the prosecutor would have liked to have presented, but could not because of its slim probative value and great prejudice to Johns.

We do not find this evidence to have affected Johns' substantial rights in this case, however. Most important to this determination is the overwhelming evidence against Johns independent of, and untainted by, the prosecutor's misstep. Johns' plane was continually monitored at least from before the second drop site through Coley's contact with the Tampa airport. The similarities of the bags at the two drop sites, the testimony that the height finder radar had continuously monitored the plane from a point prior to the first drop, and the many trackers involved in the chase provided the icing on the cake. Johns' theory that a switch had occurred and that his plane was incapable of performing the cocaine drops was thoroughly contradicted on rebuttal, and his alibi defense was weak.

In the face of such strong evidence, we cannot believe that this single straying by the prosecutor from the appropriate evidence affected Johns' substantial rights. Accordingly, the argument was not plain error.

In investigating Johns' claims of prosecutorial misconduct, then, we have found minimal error, none of which warrants the reversal of Johns' convictions. Accordingly, his convictions are

AFFIRMED.