**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ronald Willet METZGER, Defendant-Appellant.**

**No. 84–5804.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 1, 1985.

Decided Dec. 13, 1985.

Rehearing and Rehearing En Banc Denied Jan. 3, 1986.

Allen W. Holbrook, argued, court appointed, Holbrook, Gary, Wible & Sullivan, Owensboro, Ky., for defendant-appellant.

Louis DeFalaise, U.S. Atty., Barbara E. Edelman, John M. Compton, argued, Lexington, Ky., for plaintiff-appellee.

Before KRUPANSKY and MILBURN, Circuit Judges, and NEESE, Senior (Retired District) Judge *.

MILBURN, Circuit Judge.

Defendant appeals his jury convictions for transporting explosives in interstate commerce with intent to kill or injure, destruction of a vehicle used in interstate commerce, possession of an unregistered firearm, and making a destructive device without payment of the required making tax. Defendant argues that the trial court erred in (1) failing to suppress items seized from the vehicle, (2) failing to dismiss the indictment because the government failed to allege essential elements of the offenses, (3) admitting into evidence documents regarding the manufacturing situs of certain explosives and the registration of alleged destructive devices, (4) admitting into evidence the results of scientific tests performed on residue from the destroyed vehicle, (5) admitting into evidence both the results and the videotape of an explosion on a demonstration vehicle, (6) failing to

voir dire the jury concerning their exposure to mid-trial publicity, and (7) in imposing consecutive sentences. Defendant also argued insufficiency of evidence on several elements of the crimes. For the reasons that follow, we affirm in part and reverse in part.

## I.

On August 22, 1979, defendant's wife, Dorothy Jane Metzger, and her ten-year old son, Billy, were killed as a result of an explosion inside the automobile in which they were riding. The facts developed at trial showed that earlier that day Mrs. Metzger had driven to Lexington, Kentucky, where she made several stops. Most notably, Mrs. Metzger purchased ten (10) sticks of Hercules dynamite and five (5) Hercules blasting caps, apparently at the direction of her husband. Mrs. Metzger, who operated a small gift shop, also made a Seventy-eight and 31/100 Dollar ($78.31) purchase from a craft shop in Lexington. Both the explosives and the materials from the craft shop were manufactured outside of Kentucky.

Later that day Mrs. Metzger met her husband, defendant Ronald Willet Metzger, and her son and daughter of a previous marriage for supper in Lexington, following which the Metzgers traveled home. Mrs. Metzger and her son, Billy, rode in one car while Mr. Metzger and Mrs. Metzger's daughter, Tina, rode in another. Defendant and Tina arrived home first. The explosion that killed Mrs. Metzger and Billy occurred approximately four hundred (400) yards from their home at the only spot in the rural road visible from the Metzgers' home.

In an effort to determine the cause and origin of the explosion, law enforcement officers obtained materials with explosive residues both at the scene on the night of the explosion and at the Kentucky State Police post at Richmond the next morning. Subsequent scientific analysis revealed that no explosive residue from Hercules dyna-

* The Honorable C.G. Neese, now of Nashville, Tennessee, sitting by designation, retired as a

district judge of the United States District Court for the Eastern District of Tennessee.

mite was present in any sample taken from Mrs. Metzger's car but that monomethylamine nitrate (MMAN), which exists only in DuPont's Tovex, was present.

On February 1, 1984, a federal grand jury returned a five-count indictment against defendant. Count 1 was severed and subsequently dismissed. Thereafter, the case proceeded to trial on Counts 2 through 5. (See Appendix for wording of Counts 2 through 5.) At trial, a government witness testified that defendant told him that he had "switched" the dynamite which caused the explosion and that he, the defendant, had to be the first person to the site of the explosion. According to the witness, defendant had also explained why he had killed his wife and stated he had no choice as to his stepson.

During the investigation agents of the Alcohol, Tobacco & Firearms Bureau ("ATF") exploded an automobile of the same make and model as Mrs. Metzger's using ten (10) sticks of Hercules dynamite. An inaudible videotape of that explosion was shown to the jury, and, based in part on this demonstration, an ATF agent testified that the fatal explosion was the result of the intentional detonation of an improvised explosive device and not the result of any accident or other unintentional cause.

On August 23, 1984, the jury returned a verdict of guilty on all four remaining counts. In a judgment rendered the same day the district court sentenced defendant to two life sentences and two ten-year sentences and ordered that the sentences be served consecutively.

## II.

### A. Search of Automobile

Defendant's first argument is that certain pieces of evidence, exhibits 18 through 23, were seized in violation of his fourth amendment rights and, therefore, should have been suppressed at trial. The chal-

lenged exhibits were samples taken from Mrs. Metzger's car the morning after the explosion. Two of the exhibits, 18 and 20, were subsequently discovered to contain traces of MMAN. The only other exhibit discovered to contain MMAN, exhibit 17, has not been challenged by defendant. These exhibits were important to the government's case because MMAN is not found in Hercules dynamite, the type which Mrs. Metzger had purchased, but is present only in Tovex.

In arguing that exhibits 18 and 20 were improperly seized defendant notes the following facts. At approximately 1:15 a.m. on August 23, 1979, ATF Special Agent John Simms took several samples from the Metzger vehicle, including exhibit 17. The vehicle was then towed to the Kentucky State Police Post in Richmond where at approximately 7:45 a.m. Special Agents Rapier and Beam continued the investigation and obtained exhibits 18 and 20.[1]

Defendant and the government agree that the initial intrusion by ATF agents was constitutionally permissible. However, defendant argues that "such warrantless entries are only valid for the initial entry and any subsequent entries, once the exigency has passed, must meet the standards for either an administrative or a criminal warrant." Brief of Defendant-Appellant at 8. We disagree.

■ The explosion of a vehicle clearly creates an exigency justifying a warrantless entry by police, fire, and rescue workers. It is equally clear that once on the scene of an explosion "officials need no warrant to *remain* for 'a reasonable time to investigate the cause of the [explosion].'" *Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641, 646–47, 78 L.Ed.2d 477 (1984) (emphasis in original) (footnote omitted) (quoting *Michigan v. Tyler,* 436 U.S. 499, 510, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486 (1978)).

---

**1.** We recognize, as the government points out, that there was conflicting testimony as to whether Agent Simms seized exhibit 18 on the scene or whether Agent Beam seized it later that morning. However, because we hold that defendant had no reasonable expectation of privacy, regardless of when the items were seized, it is unnecessary to address this conflict.

The fact that the investigators did not remain with the vehicle while it was being removed from the scene, but instead made what is the equivalent of a "re-entry," does not change the result. Rather, "[t]he critical inquiry is whether reasonable expectations of privacy exist in the ... damaged premises at a particular time...." *Clifford*, 104 S.Ct. at 646 n. 3. A determination of whether defendant had a reasonable expectation of privacy is, of course, made by looking at the totality of the circumstances.

In the instant case defendant testified that the vehicle was registered in his name. It is well-settled, however, that ownership interest is only one fact to be considered and standing alone will not give defendant a reasonable expectation of privacy. *See Rawlings v. Kentucky*, 448 U.S. 98, 105–07, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980). Moreover, it is instructive that the vehicle was considered "Jane Metzger's personal vehicle." Brief of Defendant-Appellant at 3; *see also id.* at 33. We fail to see how defendant, absent more than an ownership interest, had a reasonable expectation of privacy in his wife's personal vehicle.

We further note that the condition of the vehicle following the explosion is an appropriate consideration in determining the extent of defendant's expectation of privacy. *Cf. Clifford*, 104 S.Ct. at 646 ("[s]ome fires may be so devastating that no reasonable privacy interests remain in the ash and ruins...."). Pictures of the vehicle taken after the explosion show that it was virtually demolished. Although the record reflects that the vehicle was a 1977 Plymouth Volare station wagon, it is difficult to discern that by looking at pictures of the remains of the vehicle. Mrs. Metzger's vehicle was reduced to little more than scrap metal, and defendant's asserted expectation of privacy in the demolished vehicle cannot be characterized as reasonable.

Finally, it is significant that the property at issue was a vehicle. "Privacy expectations will vary with the type of property,"

*Clifford*, 104 S.Ct. at 646, and it has long been recognized that "[o]ne has a lesser expectation of privacy in a motor vehicle...." *Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974), *quoted in United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977).

Accordingly, based on the above factors, we hold that exhibits 18 through 23 were not seized in violation of defendant's fourth amendment rights.

### B. *Sufficiency of Indictment*

Defendant's second argument is that the indictment failed either to include an allegation of the essential elements of the offenses or give him adequate notice of what he was to be prepared to defend against. Specifically, defendant contends that since the indictment did not contain definitions of "explosive," "destructive device," and "interstate commerce," it was invalid. We disagree.

In *United States v. Marra*, 481 F.2d 1196, 1199 (6th Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973), we adopted the position that

> [a]n indictment does not have to be put in the most definite and certain terms possible. [Rather an] indictment is sufficient if it (1) alleges all of the elements of the offense; (2) fairly informs the defendant of what he must be prepared to meet; (3) protects him against double jeopardy; and (4) enables the Court to determine whether the facts alleged are sufficient in law to withstand a motion to dismiss or to support a conviction.

Applying the above standard to the instant case, we hold that the government's failure to define "explosive," "destructive device," and "interstate commerce," in the indictment does not render the indictment invalid.

### C. *Admissibility of Certificates of Absence of Public Record or Entry Pursuant to Federal Rule of Evidence 803(10)*

We next address defendant's argument that the district court erred in admitting

two documents into evidence. The first document challenged by defendant, exhibit 9, was admitted to show the interstate commerce element of Count 2. This document contains the statement that "a diligent search of [ATF records] failed to reveal that E.I. du Pont de Nemours & Company, Inc. or Hercules Incorporated has ever been licensed to manufacture explosives in the State of Kentucky, at any time." App. at 75. The second document challenged by defendant, exhibit 10, was admitted to show that defendant had not registered any destructive device (an element of Count 4) and had not paid the making tax for such a device (an element of Count 5). In exhibit 10 it is stated that "after a diligent search of [approved applications to make and register firearms] no approved applications from RONALD WILLETT METZGER [were found]." App. at 77. The district court admitted both documents under Federal Rule of Evidence 803(10).

In contending that exhibits 9 and 10 were inadmissible, defendant makes two arguments. Defendant first argues that Rule 803(10) must be read in conjunction with Rule 803(8)(C) which prevents the government from using "factual findings resulting from an investigation made pursuant to authority granted by law." Defendant argues that the limitation contained in Rule 803(8)(C) should be read into Rule 803(10). In so doing, defendant relies on *United States v. Oates*, 560 F.2d 45 (2d Cir.1977).

In *Oates* the Second Circuit read Rule 803(6) (Records of regularly conducted activity) in conjunction with Rule 803(8)(C) and stated that:

> The *effect* of FRE 803(8)(B) and (C) was to render law enforcement reports and evaluative reports inadmissible against defendants in criminal cases. It is thus clear that the only way to construe FRE 803(6) so that it is reconcilable with this intended effect is to interpret FRE 803(6) and other hearsay exceptions in such a way that police and evaluative reports not satisfying the standards of FRE 803(8)(B) and (C) may not qualify for

admission under FRE 803(6) or any of the other exceptions to the hearsay rule. 560 F.2d at 77 (emphasis in original). The problem with defendant's argument that the rule announced in *Oates* should be applied in the instant case is twofold. First, the analysis applied by the Second Circuit in *Oates* has not been uniformly accepted by other circuits. *See, e.g., United States v. King*, 613 F.2d 670, 673 (7th Cir.1980), (announcing what appears to be the better rule in dealing with the admissibility of records under Rule 803(6); such records are admissible as long as the declarant testifies; the restriction in Rule 803(8)(C) "does not preclude admissibility under another exception to the hearsay rule."). Similarly, this circuit has never adopted the *Oates* analysis. Furthermore, the Second Circuit (which announced the rule), along with the Ninth and Eleventh Circuits, has expressly refused to apply the restrictions of Rule 803(8)(C) to Rule 803(10). *See United States v. Yakabov*, 712 F.2d 20, 24–27 (2d Cir.1983); *United States v. Martinez*, 700 F.2d 1358, 1364–65 (11th Cir. 1983); *United States v. Neff*, 615 F.2d 1235, 1242 n. 7 (9th Cir.), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980).

Had it so chosen, Congress could have included the restriction found in Rule 803(8)(C) in Rule 803(10), but it did not. Moreover, although we recognize that at times "the technical requirements of [the] rules must bend in order to fulfill the objectives expressed in Rule 102," 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 102[01] at 102–7 (1985), we find nothing in those objectives which would even remotely suggest that the restrictions of Rule 803(8)(C) should be grafted onto Rule 803(10).

■ In terms of fairness we see no reason why the documents should not have been admitted. Indeed, defendant does not challenge the accuracy of the statements made in exhibits 9 and 10. *Compare United States v. Yakabov*, 712 F.2d 20, 24 (2d Cir.1983) (where the accuracy of the statements were challenged). With regard to

the possibility of unjustifiable expense and delay, clearly, to require the government to present live testimony from the custodian of the records at issue would create rather than eliminate unjustifiable expense and delay. Finally, live testimony would add little or nothing to the jury's ability to ascertain truth or to the just determination of the proceedings. Accordingly, we now join the Second, Ninth and Eleventh Circuits in holding that the restriction of Rule 803(8)(C) is inapplicable to Rule 803(10).

■ Defendant also asserts that the admission of exhibits 9 and 10 under Rule 803(10) violated his sixth amendment right to confront witnesses against him. Although we have not addressed this issue, other circuits have concluded that the use of documents to show the absence of public record or entry is not violative of the confrontation clause. *See, e.g., United States v. Herrera-Britto*, 739 F.2d 551, 552 (11th Cir.1984); *United States v. Wilson*, 732 F.2d 404, 413 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984); *United States v. Lee*, 589 F.2d 980, 986–89 (9th Cir.), *cert. denied,* 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 382 (1979); *United States v. Thompson*, 420 F.2d 536, 544–45 (3d Cir.1970). For the reasons that follow, we agree with these circuits.

In *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980), the Supreme Court noted that "[i]n the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." In an accompanying footnote, the Court further explained that "[a] demonstration of unavailability, however, is not always required. In *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), for example, the Court found the utility of trial confrontation so remote that it did not require the prosecution to produce a seemingly available witness." *Roberts*, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7.

Rather, as the Supreme Court has noted, "[t]he focus of the Court's concern has been to insure that there 'are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant,'...." *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972) (quoting *Dutton*, 400 U.S. at 89, 91 S.Ct. at 220).

In *Dutton* the Supreme Court held hearsay admissible against a confrontation clause challenge and noted the following indicia of reliability to be determinative:

(1) The statement contained no express assertion about past facts.

(2) The declarant was in a position to have personal knowledge of the matters in the statement.

(3) The possibility that the declarant's statement was founded on faulty recollection [was] extremely remote.

(4) The circumstances surrounding the making of the statement were such that the possibility of misrepresentation was unlikely.

*United States v. Lee*, 589 F.2d at 988 (construing *Dutton*, 400 U.S. at 88–89, 91 S.Ct. at 219); *see also United States v. Barlow*, 693 F.2d 954 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983).

Applying these factors to the instant case, we conclude that the admission of exhibits 9 and 10 pursuant to Rule 803(10) did not violate defendant's sixth amendment right to confront witnesses. Unlike *Dutton* the first indicium is not present; the statements were express assertions of facts, not opinion. However, as we have previously held, the absence of this factor is not controlling when, as here, other adequate indicia are present. *Barlow*, 693 F.2d at 965.

Turning to the second factor, the declarants in both challenged documents had custody of the records searched and, therefore, had personal knowledge that the search was made. Third, since the statements attested to the diligent search of records under the declarant's custody—and not some event distant in time—the possi-

bility that the declarant's statement was founded on faulty recollection is extremely remote.

With regard to the fourth factor, it is important that the certificates were filed by officials who were not connected with the investigation. This reduces the possibility of any misrepresentation. Moreover, in the instant case other indicia of reliability are present. For example, "the 'yes or no' of whether a license has been issued [and the fact that] the records from which the evidence comes are open to the public [increases] the probability that any errors will be found and corrected...." *United States v. Harris*, 551 F.2d 621, 622 (5th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 125, 54 L.Ed.2d 98 (1977).

In summary, since the "utility of trial confrontation is ... remote," *Ohio v. Roberts*, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7, and adequate indicia of reliability are present, we hold that the admission under Rule 803(10) of the challenged documents was not violative of the confrontation clause of the sixth amendment.

D. *Scientific Tests*

Defendant's next assignment of error revolves around the admission of scientific evidence showing the presence of monomethylamine nitrate ("MMAN"). As noted, the presence of the ingredient MMAN showed that the source of the explosion was Tovex rather than Hercules dynamite.

The presence of MMAN on the vehicle was shown through the testimony of George Peterson, an ATF chemist. Peterson testified that he was able to discover trace quantities of MMAN through the use of thin-layer chromatography. Defendant does not dispute that thin-layer chromatography is an accepted scientific technique but argues that the use of thin-layer chromatography as applied to discover the presence of MMAN is new, untested, and not accepted in the general scientific community.

The requirement that scientific evidence "be sufficiently established to have gained general acceptance in the particular field in which it belongs," was announced prior to the enactment of the Federal Rules of Evidence in *Frye v. United States*, 293 Fed. 1013 (D.C.Cir.1923). Although "[a] number of the federal courts have responded to the enactment of Rule 702 by rejecting the *Frye* standard, [this circuit] still predicate[s] the admission of scientific evidence on general acceptance in the community." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[03] at 702–17 through 702–18 (1985) (footnotes omitted) (citing *United States v. Brady*, 595 F.2d 359 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); *United States v. Brown*, 557 F.2d 541, 556 (6th Cir.1977)).

In arguing that the evidence presented by the government should not have been admitted defendant relies on *United States v. Brown*, 557 F.2d 541 (6th Cir.1977). In *Brown* the defendant admitted that "ion microprobic analysis [was] not a new technique and [had] attained a sufficient degree of acceptance in the field of mass spectrometry." *Id.* at 557. However, the defendant in *Brown* argued that the application of the test to make hair comparisons was a new technique which had not been accepted in the scientific community. *Id.* We agreed with the defendant and held the testimony should have been excluded by the trial court. In so holding, we emphasized several facts which demonstrated the government's failure to prove that microprobic analysis, as used, was a generally accepted procedure. For example, "[n]either [of the witnesses] claimed to be an expert on human hair." *Id.* Moreover, "[b]oth [witnesses] concede[d] that their test results [had] not been duplicated elsewhere and neither was able to cite any authority in the field in support of their positions." *Id.*

In the instant case witness Peterson was an expert on chemicals. In fact, in addition to having earned a bachelor's degree in chemistry and a master's degree in polymer chemistry, Peterson had attended numerous courses and seminars in dealing with explosives. With this background, training, and his on-the-job experience with the

ATF, Peterson had previously qualified as an expert in state and federal courts approximately fifty (50) times. Peterson's unrebutted testimony also showed that numerous crime laboratories, including those of the ATF and local and state police departments across the country, used the test at issue.

Peterson further testified that he had co-authored an article ("Identification of Explosives Containing Alkylammonium Nitrates by Thin-layer Chromatography") which had been published in the *Journal of Forensic Science.* Defendant makes much of the fact that "Mr. Peterson had published a paper on this test, which was the only publication in the entire field." Brief of Defendant-Appellant at 20. The implication is that a publication supports a witness only where the view held by the witness is widely shared by other experts in the field. We believe this view is too limited. Articles in professional journals are also of great value in that the basis of the article is subjected to close scrutiny by other experts in the field.

■ In summary, we note that in the instant case we are dealing with the testimony of an expert in the area of his expertise, whose work in the narrow area at issue has been published and adopted by local, state and federal agencies across the nation. Under these circumstances, we hold that Peterson's testimony as to the results of thin-layer chromatography to discover trace quantities of MMAN was properly admitted under Federal Rule of Evidence 702.

E. *Admissibility of Videotape and Related Testimony*

As noted, prior to trial ATF agents exploded ten (10) sticks of Hercules dynamite in a 1977 Plymouth Volare station wagon. An inaudible videotape of that explosion was shown to the jury over defendant's objection. ATF Agent Cooper presented the jury with his conclusions as to the cause of the explosion of Mrs. Metzger's car based in part on a comparison of the result of this demonstration and the Metz-

ger vehicle. In connection with the videotape and related testimony, defendant now advances three arguments. First, defendant argues that the "experiment" was not conducted under conditions of substantial similarity to the actual event. Second, he argues that no foundation was laid for Cooper's "scientific" conclusions. Third, defendant argues that the probative value of the display was outweighed by the prejudicial effect.

Defendant's first argument is based on the government's failure to show three things. First, defendant notes that the structural integrity of the test vehicle relative to the victim's vehicle was not shown. Specifically, defendant points out that the government did not introduce evidence showing the mileage on either vehicle, climatic conditions to which the test vehicle had been subjected, whether the test vehicle had been wrecked, or whether there were any differences in the quality of the test vehicle's metal. Second, defendant notes that the test vehicle contained no luggage or other items to absorb the blast. Third, defendant notes that there was no control experiment.

■ Experimental evidence may properly be admitted only if the test was conducted under conditions substantially similar to those of the event. However, the substantially similar standard is a flexible one which, even when construed strictly, does not require that all variables be controlled. E. Cleary, *McCormick on Evidence,* § 202, at 601–02 (1984); *see also Randall v. Warnaco, Inc.,* 677 F.2d 1226, 1233–34 (8th Cir.1982) ("Admissibility ... does not depend on perfect identity between actual and experimental conditions."). Indeed, most "[d]issimilarities between experimental and actual conditions affect the weight of the evidence, not its admissibility." *Szeliga v. General Motors Corp.,* 728 F.2d 566, 567 (1st Cir.1984).

■ In the instant case the experiment was used to show that Metzger's vehicle was not damaged by ten (10) sticks of Hercules dynamite. Thus, the government

attempted to show major differences between the test vehicle, after being damaged by the type and amount of dynamite allegedly present, and the Metzger vehicle. Possible differences such as those focused on by the defendant, therefore, go more properly to the weight than to admissibility.

■ Defendant's next argument—there was no proper foundation for the admissibility of Cooper's opinion—is based on *United States v. Brown,* 557 F.2d 541 (6th Cir.1977). Federal Rule of Evidence 702 provides:

Testimony by Experts

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

With regard to scientific testimony, this court, as noted, has held that "[a] necessary predicate to the admission of scientific evidence is that the principle upon which it is based 'must be sufficiently established to have gained general acceptance in the particular field to which it belongs.'" *United States v. Brown, supra,* 557 F.2d at 556 (quoting *Frye v. United States,* 293 Fed. 1013, 1014 (D.C.Cir.1923)). As we noted in *Brown:*

There are good reasons why not every ostensibly scientific technique should be recognized as the basis for expert testimony. Because of its apparent objectivity, *an opinion that claims a scientific basis* is apt to carry undue weight with the trier of fact. In addition, it is difficult to rebut such an opinion except by other experts or by cross-examination based on a thorough acquaintance with the underlying principles. In order to prevent deception or mistake and to allow the possibility of effective response, there must be a demonstrable, objective procedure for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by

which it was reached, drawing their own conclusions from the underlying facts. 557 F.2d at 556 (quoting *United States v. Baller,* 519 F.2d 463, 466 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975)) (emphasis supplied).

Defendant's argument is that "[t]he government never showed that comparisons of photographs of test vehicles or structures compared to actual vehicles or structures conformed to any generally accepted explanatory theory." Brief of Defendant-Appellant at 27–28. However, Cooper's opinion did not "claim a scientific basis." Rather, it more properly falls within the "other specialized knowledge" category of Rule 702. As such, the testimony does not carry with it any "aura" of special reliability and "the jury can evaluate such testimony without being overawed by the expert." 3 J. Weinstein & M. Berger, *Weinsteins' Evidence* ¶ 702[02], at 702–11 (1985). Consequently, the third prong of the *Brown* test—"general acceptance in the particular field"—is not required for testimony based on "other specialized knowledge." *Cf. United States v. Snow,* 552 F.2d 165, 167–68 (6th Cir.), *cert. denied,* 434 U.S. 970, 98 S.Ct. 519, 54 L.Ed.2d 458 (1977) (admission of FBI agent's testimony on comparison of photographs not abuse of discretion).

■ Defendant's third argument addresses only the portion of the videotape showing the explosion of the demonstration vehicle. With regard to this evidence defendant argues that the showing of the actual explosion "added nothing to the government's case" and, alternatively, that the probative value was substantially outweighed by the prejudicial effect. In analyzing these arguments our inquiry is first guided by Federal Rule of Evidence 401 (Definition of "Relevant Evidence"), and second by Federal Rule of Evidence 403 (Exclusion of Relevant Evidence on Grounds of Prejudice, . . .).

To address defendant's contentions adequately, it is necessary to review several facts. On the day of the accident, Mrs. Metzger picked up ten sticks of Hercules

dynamite and five blasting caps. It was the government's position that the explosion was not a result of an accidental discharge of the items carried by Mrs. Metzger. To support this, the government relied on three points relative to our inquiry here. First, the government showed that ten sticks of Hercules dynamite would have caused substantially more damage than what occurred to the Metzger vehicle. Second, the government noted that four of the five blasting caps purchased not only failed to go off accidentally but actually survived the explosion. Third, the government pointed out that even when subjected to the more severe explosion caused by the ten sticks of Hercules dynamite, the blasting caps would not be destroyed. While the showing of the actual explosion may not have been relative to the first two of the above points, it would have aided the jury in the third. That is, the fact that the blasting caps could withstand such an explosion makes it less likely that one went off accidentally. Precisely how much impact the blasting cap had been subjected to, and withstood, would have been difficult to explain, and the use of the videotape for that purpose was not improper. In short, for the jury to be able to visualize the actual explosion which the blasting caps withstood could aid in their determination of whether the explosion was accidental or not.

We next turn to an inquiry of whether the probative value was substantially outweighed by unfair prejudice. We begin this section of our analysis by noting that great deference to the district court's weighing is appropriate. As noted by the Third Circuit, "[i]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). As unfair prejudice defendant argues that the explosion "created an image of what the actual vehicle must have looked like when it exploded." Brief of Defendant-Appellant at 28. Were the explosion a re-creation of the accident, de-

fendant's position would have more merit. However, the demonstration at issue was not to show what the explosion of the Metzger vehicle "looked like" but rather what it did *not* look like. It was basic to the government's argument that the explosion shown on the videotape was substantially more serious than the explosion of Mrs. Metzger's car. Thus, while an explosion of an equal or lesser strength than what occurred to the Metzger vehicle might have left an impression of what the actual explosion may, at least, have looked like, such is not the case here. Moreover, even if on a *de novo* review this court were inclined to agree with defendant, reversal would be inappropriate because the case does not present a set of facts so egregious that deference to the district court is inappropriate.

## F. Interstate Commerce Element of 18 U.S.C. § 844(d)

Count 2 of the indictment included a charge that defendant violated 18 U.S.C. § 844(d), which provides in relevant part:

Whoever transports or receives, or attempts to transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, shall be imprisoned ...; and if death results, shall be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

The government's evidence at trial included proof that Tovex was not manufactured in Kentucky. However, defendant argues that in order to meet the interstate commerce element, case law requires that "there must be direct evidence that a defendant transported or received an explosive across state lines." Brief of Defendant-Appellant at 30. To support this, defendant argues that the "interstate commerce" element modifies "whoever" rather than "explosives."

In *McElroy v. United States*, 455 U.S. 642, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982), the Supreme Court addressed the construction of "interstate commerce" in 18 U.S.C. § 2314. As is the case with section 844(d), section 2314 includes the "whoever ... transports in interstate or foreign commerce" prefatory language. The Court rejected the defendant's "unarticulated assumption that 'interstate commerce,' as used in [section 2314] does not continue after the [item] has crossed the state border," 455 U.S. at 648, 102 S.Ct. at 1336, and held that "the stream of interstate commerce may continue after a state border had been crossed." 455 U.S. at 654, 102 S.Ct. at 1339.

As noted, the statutory language at issue in section 844(d) is identical to that reviewed in *McElroy*. Thus, it is instructive that subsequent to the Court's interpretation of "interstate commerce" in *McElroy*, Congress amended section 844(d) without in any way altering this language. Pub.L. No. 98–473, Title II, § 1014(1) and (2), 98 Stat. 2142 (1984).

 In summary, we disagree that the government must show that defendant personally transported explosives across state lines or received them during or after such an act of transportation in interstate commerce. Thus, we hold that the government's burden as to the interstate commerce element of section 844(d) is met by showing, as here, that the movement of the explosive was a "continuation of the movement that began out of state." *McElroy*, 455 U.S. at 654, 102 S.Ct. at 1339.

### G. *Affecting Interstate Commerce Element of 18 U.S.C. § 844(i)*

Defendant's next argument is that there was insufficient evidence to support his conviction of violating 18 U.S.C. § 844(i), which provides in relevant part:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned ... and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

Defendant attacks only the sufficiency of the evidence showing that Mrs. Metzger's vehicle was "used in interstate ... commerce or [an] activity affecting interstate ... commerce." Again, we briefly review the relevant facts before addressing this argument.

Mrs. Metzger operated a small gift shop in Estill County, Kentucky. In connection with this business, Mrs. Metzger acquired supplies directly from businesses outside Kentucky. On the date of her death, Mrs. Metzger traveled to Lexington, Kentucky, in order to run several errands. A large portion of those errands were personal but at least one was business-related. As she frequently did, Mrs. Metzger went by the Kennedy Craft Shop in Lexington where she made purchases totaling Seventy-eight and 31/100 Dollars ($78.31). Among these purchases were rolls of nylon macrame cord which in turn had been purchased by the Kennedy Craft Shop from distributors in Georgia and Tennessee. These items were being transported in Mrs. Metzger's vehicle at the time of the explosion. With this factual background we turn to the applicable law.

 The Supreme Court recently discussed the "interstate commerce or affecting interstate commerce" element of section 844(i) in *Russell v. United States*, —— U.S. ——, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985). In *Russell* the Court unanimously held that section 844(i) applied to an attempt to set fire to a duplex which was used as rental property. In so holding, the Court noted that "[t]he reference to 'any building ... used ... in any activity affecting interstate commerce or foreign commerce' expresses an intent by Congress to exercise its full power under the Commerce Clause." 105 S.Ct. at 2456 (footnote omitted) (ellipses in original). The Court fur-

ther noted that the legislative history of section 844(i) "suggests that Congress at least intended to protect all business property." *Id.* at 2457. However, the Court also noted that "this statute only applies to property that is 'used' in an 'activity' that affects commerce." *Id.* Thus, the question presented is whether an automobile transporting goods which are in interstate commerce and are to be sold at a business otherwise involved in interstate commerce is being used in an activity which affects interstate commerce. We are of the opinion that clearly it is.

### H. *Sufficiency of Evidence on Counts 4 and 5*

Defendant's next argument is that there was insufficient evidence to support the verdict on Counts 4 and 5. This argument is made in four parts. First, defendant states that there is insufficient evidence showing a "destructive device" because all the component parts were not identified. Specifically, defendant states that the government did not "show what the detonating device was." Reply Brief of Defendant-Appellant at 18. Defendant's assertion, however, is incorrect. The government presented evidence including, notably, the testimony of two witnesses, Pansy Lee and Wanda Tipton. Ms. Lee, a friend of the Metzgers, testified that she saw a "black box" in defendant's pickup truck just hours prior to the explosion. Ms. Tipton, one of the emergency personnel on the scene, also observed a "black box" in the back of Mrs. Metzger's car following the explosion but testified that after Mr. Metzger visited the scene, the black box was gone.

Moreover, although the government produced evidence of a detonating device, it was not required to do so. Defendant argues that dynamite is not a "destructive device" as defined by 26 U.S.C. § 5845.

■ The definition of a destructive device set forth in subparagraph (3) of section 5845(f) includes "any combination of parts," even if lawful in and of themselves, if "intended for use in converting any de-

vice into a destructive device as defined in subparagraph (1)." Subparagraph (1) includes "(A) bomb." Thus, the actual detonation of dynamite (a bomb), by whatever source, is a destructive device as defined by 26 U.S.C. § 5845. *See United States v. Morningstar,* 456 F.2d 278 (4th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972), *cited in United States v. Greer,* 588 F.2d 1151, 1156 (6th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979).

The next part of defendant's argument is premised on his assertion that, on the government's theory, "the conversion of the two non-criminal items, the dynamite and the caps, was not accomplished until just a few hours before the actual explosion." Brief of Defendant-Appellant at 43. Assuming this factual background, defendant argues that he was entitled to a reasonable period of time in which to register the device.

■ Count 4 included the charge that defendant possessed a firearm which was not registered to him as required by 26 U.S.C. § 5841. Count 5 included the charge that defendant made a firearm without paying the tax as required by 26 U.S.C. § 5821. Defendant's argument that registration need only be completed within a reasonable period of time after the device is made is without merit. Section 5841(c) provides without ambiguity that the registration is to be completed by the "maker ... *prior* to the ... making [of the] firearm." (Emphasis added). Similarly, the tax provisions mandate the payment of the tax required in section 5821 before the making. 26 U.S.C. § 5822.

■ The fourth part of defendant's argument is that there was insufficient evidence showing the failure to pay the making tax. This argument goes only to Count 5 of the indictment, that is, making of a firearm without "paying the making tax as required by" 26 U.S.C. § 5821. At trial the government admitted evidence by way of exhibit 10, discussed *supra,* that a diligent search of the National Firearms Registra-

tion and Transfer Record had failed to turn up any application by defendant to make a firearm. Defendant, however, argues that proof of a failure to register alone is insufficient to show that he failed to pay the tax. We agree.

In *United States v. Stout*, 667 F.2d 1347 (11th Cir.1982), the Eleventh Circuit held as follows:

> The custodian of the registry also could not certify that neither defendant had paid a making tax or transfer tax. Payment of the making tax or transfer tax is represented by an adhesive stamp of the proper denomination, and properly cancelled, affixed to the appropriate application for registration. 27 C.F.R. §§ 179.62; 179.84 (1981). "National Firearms Act Stamps" are purchased from District Director of the Internal Revenue Service "in the collection district in which the stamps are to be used...." and not from the Bureau of Alcohol, Tobacco and Firearms, 27 C.F.R. § 179.161 (1981). No record that a stamp has been purchased would be contained in the NFRTR until an approved application with the stamp affixed was filed in the registry.... While the applicable statutes and regulations are ambiguous as to precisely when the transfer tax or making tax is "paid," it is certain that payment is achieved at some point prior to registration of the firearm in the firearms registry.

*Id.* at 1352 (footnote and citations omitted).

The government argues that *Stout* can be distinguished. Specifically, the government points out that it did not rely solely on the exhibit reflecting the absence of an entry in the NFRTR. The government states that, in addition to exhibit 10, failure to pay tax was sufficiently established through the testimony of ·ATF Agent Frank Eddy that Metzger failed to make application either to make or register a destructive device. However, the testimony of Agent Eddy added nothing. He simply testified that exhibit 10 reflected that no tax was paid by defendant for making or possessing such a device. Although the document does so state, the statement was beyond the knowledge of the declarant.

### I. *Publicity During Trial*

Defendant claims that the district court erred in failing to *voir dire* the jury concerning their exposure to mid-trial publicity. The publicity at issue occurred throughout the trial and included articles that discussed evidence excluded from the jury's hearing. The articles, for example, mentioned defendant's prior convictions (murder and firearms violation), testimony regarding sexual assaults against his stepdaughter, and physical assaults against his stepson. The district court overruled defendant's motion to *voir dire* the jury observing that "the court has on every occasion when the jury separated, admonished the jury not to read any newspaper accounts relative to the case or listen to any news broadcasts relative to the case and to insulate themselves in every way from all outside contact relative to the case." From the record we note that defendant did not make any showing of a violation of the court's instructions.

This court has adopted the position that "[w]here a jury has been clearly admonished not to read newspaper accounts of the trial in which they are serving as jurors, it is not to be presumed that they violated that admonition." *Rizzo v. United States*, 304 F.2d 810, 815 (8th Cir.), *cert. denied sub nom., Nafie v. United States*, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962), *quoted in United States v. Giacalone*, 574 F.2d 328, 335 (6th Cir.1978). Thus, even when material presented by the news media is prejudicial to the defendant, absent a showing that the jury violated the admonishment, a conviction will not be reversed.

### J. *Consecutive Sentences*

As noted, defendant was convicted on four counts. Count 2 charged a violation of 18 U.S.C. § 844(d), and Count 3 charged a violation of 18 U.S.C. § 844(i). Following his conviction, defendant was sentenced to consecutive life terms for these violations

and now argues this sentencing was improper. Relying on *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978), defendant argues that the appropriate analysis requires the court to make two inquiries. Defendant argues that first the court must determine whether the imposition of the sentences violated the double jeopardy clause of the fifth amendment. The second inquiry urged by defendant is whether, as a matter of statutory construction, Congress intended to impose cumulative punishments. However, the Supreme Court has recently held that "the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended ... to impose multiple punishments, imposition of such sentences does not violate the Constitution." *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981).

■ "[T]o determine whether Congress intended the same conduct to be punishable under two criminal provisions [the] appropriate inquiry ... is 'whether each provision requires proof of a fact which the other does not.'" *Ball v. United States*, — U.S. —, 105 S.Ct. 1668, 1672, 84 L.Ed.2d 740 (1985) (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)). Thus, the only question which need be answered is whether subsections (d) and (i) require proof of a fact that the other does not. Subsection (d) addresses and requires proof of the transportation or receipt of explosives which have been transported in interstate commerce. On the other hand, subsection (i) addresses and requires proof of the destruction of property which is *"used in* interstate or foreign commerce or in any activity affecting interstate or foreign commerce." (Emphasis added). Conversely, in order to convict under subsection (d), the government need not prove that the property destroyed was used in interstate commerce. Similarly, a conviction under subsection (i) can be obtained regardless of whether the explosives were at any time transported in interstate commerce. Ac-

cordingly, we hold that the district court did not err in imposing consecutive sentences under subsections (d) and (i) of 18 U.S.C. § 844.

## III.

In accordance with the foregoing, we AFFIRM defendant's convictions under Counts 2, 3 and 4 of the indictment, but REVERSE defendant's conviction under Count 5 of the indictment. In all other respects, the district court is AFFIRMED.

### APPENDIX

### COUNT 2

THE GRAND JURY FURTHER CHARGES:

That on or about August 22, 1979, in the Eastern District of Kentucky,

RONALD WILLET METZGER

defendant herein, did transport and receive and did attempt to transport and receive in interstate commerce an explosive, with the knowledge and intent that it would be used to kill and/or injure Dorthea Jane (Harvey) Metzger, his wife, and Billy Harvey, his stepson, and to damage or destroy a vehicle; in violation of Section 844(d), Title 18, United States Code.

### COUNT 3

THE GRAND JURY FURTHER CHARGES:

That on or about August 22, 1979, in the Eastern District of Kentucky,

RONALD WILLET METZGER

defendant herein, did maliciously damage and destroy, by means of an explosive, a vehicle and personal property, which was being used in an activity affecting interstate commerce; in violation of Sections 844(i) and 844(j), Title 18, United States Code.

## COUNT 4

THE GRAND JURY FURTHER CHARGES:

That on or about August 22, 1979, in the Eastern District of Kentucky,

RONALD WILLET METZGER

defendant herein, knowingly did possess a firearm as defined by Sections 5845(a) and (f), Title 26, United States Code, to wit, a destructive device, which firearm was not registered to him in the National Firearms Registration and Transfer Record, as required by Section 5841, Title 26, United States Code; in violation of Sections 5861(d) and 5871, Title 26, United States Code.

## COUNT 5

THE GRAND JURY FURTHER CHARGES:

That in August 1979, the exact date to the Grand Jury unknown, in the Eastern District of Kentucky,

RONALD WILLET METZGER

defendant herein, knowingly made a firearm as defined in Sections 5845(a) and (f), Title 26, United States Codes, to wit, a destructive device, in violation of the provisions of Chapter 53, Title 26, United States Code, in that he did fail to pay the making tax as required by Section 5821, Title 26, United States Code; in violation of Sections 5861(f) and 5871, Title 26, United States Code.