**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 05a0034n.06**
**Filed: January 12, 2005**

**No. 03-6050**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| EDRYCK DANTE MOONEY, | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

Before: SILER, SUTTON, and FARRIS, Circuit Judges.[*]

SUTTON, Circuit Judge. What started out as a seemingly modest dispute about Edryck
Mooney's red baseball cap and the respect to which he (and his cap) were entitled ended with three
consecutive life sentences for the young man. In March 2002, Mooney left the cap at a male
acquaintance's house. Upon realizing the mistake, he informed the man that he would drop by to
retrieve the cap. Because the acquaintance planned to leave the house to run an errand, he placed
the baseball cap on a shovel outside of his house so that Mooney could retrieve it. Feeling slighted
by the incident, Mooney later threw a Molotov cocktail into the man's house. In reaction to other
perceived slights (one man refused to help Mooney with the first Molotov cocktail, another man

---

[*] The Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

criticized Mooney for littering a recently cleaned sidewalk with a beer bottle), Mooney and his cohorts threw Molotov cocktails at other houses and a car.

Neither the jury nor the sentencing judge reacted positively to these incidents. A jury convicted him of 25 firearm-related counts, and the court sentenced him to three consecutive life sentences plus 570 months' imprisonment. Because none of Mooney's challenges to his trial and sentences establishes reversible error, we affirm.

I.

On March 2, 2002, Mooney attended a party at the home of Jonathan Jones in Nashville, Tennessee. Discovering that he had accidentally left his hat there, Mooney asked a friend, Antonio Davis, to call Jones to tell him they would return to pick it up. Because Jones had been planning to run an errand with a cousin and a friend, he set the cap outside on top of a shovel so Mooney could get his cap during Jones's absence. As chance would have it, Mooney pulled up before Jones and the others had left. Mooney approached Jones, demanding, "Why is my hat outside? Why are you disrespecting me?" JA 174. According to Jones's testimony, Mooney took a swing at Jones and a brief scuffle ensued, though it broke up before anyone was injured.

Upset by the incident, Mooney sought help from a friend, Kenneth Thornton, to avenge this disrespect, which apparently was particularly stinging because Mooney's red hat represented his gang, the Bloods. On March 3, 2002, Mooney, Thornton, and Daraphone Visiasack (Mooney's girlfriend) discussed a plan to use Molotov cocktails (improvised explosives made by filling a bottle

with gasoline and inserting a rag as a fuse) to burn Jones's house. Mooney developed the plan with Thornton and directed the preparation of the explosive. When they arrived at Jones's home, Mooney lit the rag and threw the Molotov cocktail at Jones's house. Jones escaped the burning house but could not continue living there because of the damage.

Before this incident, Mooney had approached Davis (the friend who went with him to pick up the hat) about helping him with this first firebombing, but Davis had refused to get involved. During the evening of March 7, 2002, other individuals affiliated with the Bloods picked up Davis and took him to a hotel. Once there and once they had relieved Davis of his .25 caliber pistol, they accused Davis, a former gang member himself, of telling the police about the Jones firebombing. At the time, one of the individuals was armed with a .38 caliber pistol and another with a .357 caliber pistol. Mooney then arrived at the hotel. Believing that Jones was staying temporarily at the home of his cousin, Gary Henson, Mooney demanded that Davis burn down Henson's house to prove his loyalty. Mooney emphasized this demand by threatening to kill Davis and Davis's mother if he refused. Mooney also helped to create the Molotov cocktail by filling a bottle with gasoline, and he ordered Davis to place a t-shirt halfway into the bottle. One of Mooney's colleagues then dropped Davis off near Henson's house and gave Davis the .38 revolver. Davis, however, did not want to carry out the plan and threw the Molotov cocktail in the driveway, rather than at the house. The next day, the police found a broken bottle and a rag smelling of gasoline in Henson's driveway, and Mooney, checking to verify whether Davis had complied with his instructions, learned that Davis had not carried out the plan.

About two weeks later, on March 23, 2002, Mooney decided to finish what Davis had not. He and two accomplices made two Molotov cocktails, then planned to go to Henson's house, where the accomplices each planned to throw a Molotov cocktail—one at the front of the house, one at the back—while Mooney fired a pistol into the air to scare the occupants. In carrying out this plan, however, they did not succeed in starting a fire. One bottle went through a window in the house but its fire was extinguished before spreading, and the other bottle landed unbroken in the driveway.

On March 29, 2002, Mooney responded to another perceived slight in like fashion. While sitting in a friend's jeep in a parking lot near some condominiums, Mooney left a beer bottle on the sidewalk. A man named Darnell confronted Mooney about the littering because his girlfriend, Charity Holland, had just cleaned up the area. Only words were exchanged at the time, but after Mooney left he resorted to a by-now-familiar plan. Stopping at a gas station, Mooney directed his friend to fill a bottle with gas, then inserted a shoelace as a wick, after which they drove back to Holland's condominium. After the friend objected that they should not burn down the house because children lived there, Mooney decided to burn Holland's car instead. He threw a Molotov cocktail into Holland's car, which caught fire and which was destroyed before the fire department could put out the fire.

As a result of these incidents, federal prosecutors charged Mooney with 25 counts relating to illegal firearm possession. Most of the counts (20 of them) related to the Molotov cocktails, charging Mooney with conspiring to possess them in violation of 18 U.S.C. § 371, making them in violation of 26 U.S.C. § 5861(f), possessing them in violation of 26 U.S.C. § 5861(d), possessing

them as a convicted felon in violation of 18 U.S.C. § 922(g)(1), and using and carrying them during

and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). The remaining five counts

charged Mooney with possession of various pistols.

The jury acquitted Mooney of four counts pertaining to possession of various pistols, but

convicted him of one count of possessing a .25 caliber pistol and of 20 counts relating to the

Molotov cocktails. Based on these convictions, the district court sentenced Mooney to three

consecutive life sentences—after a conviction under § 924(c), each subsequent conviction receives

an additional life sentence, *see* 18 U.S.C. § 924(c)(1)(C)(ii)—followed by 570 months of

imprisonment. It also ordered him to pay restitution and a special assessment and, strangely but as

required by law, *see* U.S.S.G. § 5D1.1(a), it ordered him to serve three years of supervised release

after his sentence.

## II.

### A.

It is legally and factually impossible, Mooney first contends, to "possess a Molotov cocktail

*in furtherance* of the possession of the same Molotov cocktail," Mooney Br. at 43, as charged in

counts 5, 12, 19 and 25 of the relevant indictment. It is likewise impossible, he continues, to "use

and carry and possess a Molotov cocktail during and in relation to a conspiracy to receive or possess

the same Molotov cocktail," because a "conspiracy has ended when its objectives have been

achieved." *Id.* Accordingly, he concludes, the indictment should be dismissed for failure to allege

a crime. We review this legal question de novo. *See United States v. Garcia-Echaverria*, 374 F.3d 440, 445 (6th Cir. 2004).

The relevant counts charged Mooney (1) with violating § 924(c) by having "unlawfully and knowingly *used and carried* a firearm, to wit: an incendiary device commonly referred to as a Molotov cocktail, which constitutes a destructive device, during and in relation to a crime of violence . . . and knowingly possessed such firearm in furtherance of such crime of violence," (emphasis added), and (2) listed the predicate crimes of violence as violations of 26 U.S.C. § 5861(d) (which prohibits possession of an unregistered firearm) and 18 U.S.C. § 371 (which prohibits conspiracies to commit offenses against the United States). *See* JA 79 (count 5, relating to events on or about March 4, 2002); JA 85 (count 12, relating to events on March 8, 2002); JA 91 (count 19, relating to multiple firearms and events on March 23, 2002); JA 95 (count 25, relating to events on March 29, 2002). Mooney does not deny that possession of a Molotov cocktail is a crime of violence.

Given that Mooney does not deny that a predicate crime of violence exists for each count, we turn to the language of § 924(c) to determine its compatibility with the remainder of the indictment. Section 924(c)(1)(A) says that "[1] any person who, during and in relation to any crime of violence . . ., *uses or carries* a firearm, or [2] who, in furtherance of any such crime of violence, *possesses* a firearm, [3] shall, in addition to the punishment provided for such crime of violence or drug trafficking crime" receive additional punishment. (Emphasis added.) The provision thus

creates an offense (1) for using or carrying a firearm during and in relation to a crime of violence

*or* (2) for possessing a firearm in furtherance of a crime of violence.

In challenging the indictment on impossibility grounds, Mooney emphasizes the second

phrase and fails to account for the first one. Under the first part of § 924(c), no logical difficulty

(much less impossibility) arises from saying that Mooney, while possessing an incendiary device

(the crime of violence), used or carried that incendiary device (the firearm). *Cf. United States v.*

*Thompson*, 361 F.3d 918, 920–21 (6th Cir. 2004) (rejecting the argument that a conviction for failing

to register a firearm violated due process when the provision was applied to Molotov cocktails).

That is because "a conviction for 'use' of a firearm under § 924(c)(1) requires more than a showing

of mere possession." *Bailey v. United States*, 516 U.S. 137, 144 (1995). Otherwise, the Court

explained in *Bailey*, the meaning of "use" would become

> virtually synonymous with "possession" and [would] make[] any role for "carry"
> superfluous. The language of § 924(c)(1), supported by its history and context,
> compels the conclusion that Congress intended "use" in the active sense of "to avail
> oneself of." To sustain a conviction under the "use" prong of § 924(c)(1), the
> government must show that the defendant actively employed the firearm during and
> in relation to the predicate crime.

*Id.* at 150. As a general matter under the statute, then, active employment of a Molotov cocktail

requires more than simply possessing it.

As a result, no impossibility arises. Mooney was charged with using and carrying the firearm

(not just possessing it) in the relevant counts, counts 5, 12, 19 and 25. Since the relevant indictment

properly stated a charge under the first of § 924(c)'s alternative phrases, any alleged impossibility

arising from the statute's second section is irrelevant. And since each § 924(c) count lists § 5861(d)

as a predicate crime of violence—which Mooney violated by possessing a Molotov cocktail—we need not address whether a second predicate crime (conspiracy to possess a Molotov cocktail) also constituted a crime of violence or whether § 924(c) failed to state a charge by relying on that second crime.

## B.

Anticipating this interpretation, Mooney argues that it violates the Double Jeopardy Clause. Mooney Br. at 43. Not true. In *United States v. Johnson*, 22 F.3d 106 (6th Cir. 1994), we rejected a similar contention from a defendant who argued that punishing him for armed carjacking and for violating § 924(c) by using a firearm during the same armed carjacking amounted to double jeopardy. Because "Congress intended to impose additional punishment for the same conduct" and because "the Double Jeopardy Clause does not proscribe multiplying the punishment" when the legislature signals its intention to do so, we held that no constitutional violation had occurred. *Id.* at 108. Here, likewise, "[t]he language of § 924(c) is plain" and "mandates a five year, mandatory, consecutive sentence 'in addition to' the punishment for the other crime of violence," *id.*, meaning that punishing Mooney twice for the same underlying conduct in the same trial does not constitute double jeopardy.

## C.

The district court abused its discretion, Mooney next contends, by permitting the government to reopen its case to admit three facts to which Mooney had previously stipulated—that Mooney had been previously convicted of a felony and that the gasoline and beer bottles used in the Molotov cocktails satisfied the interstate-commerce-nexus requirement. We disagree. As we have explained

before in this context, "the conduct of a criminal trial is a matter within the discretion of the trial court and such discretion will not be disturbed in the absence of a clear showing of abuse." *United States v. Wilson*, 27 F.3d 1126, 1129 (6th Cir. 1994) (reviewing a district court's refusal to permit a defendant to reopen his case). In exercising that discretion, a "district court judge must consider the party's explanation for failing to introduce the evidence earlier, the admissibility of the evidence, its relevance, and the degree to which the opposing party would be prejudiced by reopening the case." *Id.*

The application of these factors here shows no abuse of discretion. Most critically, there is no reason to think that the government chose not to introduce, or failed to introduce, the evidence for improper reasons—such as to "imbue the evidence with distorted importance" or to "preclude an adversary from having an adequate opportunity to meet the additional evidence." *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985). In view of Mooney's stipulation to these facts, the government plainly did not gain a tactical advantage by waiting to admit them and did not in any way prevent Mooney from attempting to counter them. And in view of the nature of the facts, it is difficult to see how they were given any undue stress at the end of the trial rather than at some other point in the trial. *See id.* ("Where, as in this case, reopening is permitted after the government has rested its case in chief, but before the defendant has presented any evidence, it is unlikely that prejudice sufficient to establish an abuse of discretion can be established.").

Without these stipulations, Mooney counters, the government would not have been able to prove its case and the jury would have had to acquit him on 17 of the counts, proving that he was prejudiced by the delay. Mooney Br. at 45. But this contention confuses prejudice arising from a

delay in the presentation of the evidence with prejudice arising from the content of the evidence. Prejudice in this setting concerns the timing of the evidence and the tactical advantage that arises from presenting it later, not just whether the late evidence tends to show that the defendant committed the crime. *See Wilson*, 27 F.3d at 1129; *Blankenship*, 775 F.2d at 741.

D.

Mooney next argues that the district court abused its discretion by refusing to sever the counts against him into four separate cases, each dealing with a separate Molotov cocktail incident. We disagree.

An indictment may charge a defendant with multiple offenses "if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). When the joinder of offenses unduly prejudices a defendant or the government, the court "may order separate trials of counts . . . or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). And in weighing whether joinder of counts is proper, "the predominant consideration is whether joinder would serve the goals of trial economy and convenience." *United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987). Appellate courts review joinder and severance decisions for abuse of discretion. *See United States v. Cope*, 312 F.3d 757, 781 (6th Cir. 2002).

No such error occurred here. All of the alleged acts by Mooney shared a common pattern—making, possessing or using Molotov cocktails. And trying all 25 counts against Mooney in a single trial promoted economy and convenience in the most conventional of ways. It allowed

the government to present its case at only one trial; it required only one jury to be impaneled for the trial; and it required only one judge to become familiar with the case. Because the traditional reasons for joining counts applied to this case and because we customarily presume that juries can sort through the facts, even complex facts, and will apply them appropriately to the law, *see United States v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988)—a presumption borne out in this case by the fact that the jury acquitted Mooney on some counts and convicted him on others—the district court did not abuse its discretion in trying Mooney's offenses together.

E.

Mooney next claims that the district court abused its discretion by admitting evidence that he belonged to a gang. While relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice," Fed. R. Evid. 403, our deferential review of such decisions requires us to take a "maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect." *United States v. Gibbs*, 182 F.3d 408, 429 (6th Cir. 1999).

Viewed from this perspective, the district court did not abuse its discretion in concluding that the evidence's probative value outweighed its prejudicial effect. As the district court noted, Mooney's gang membership helped to explain why he did what he did—and indeed helped to explain the first incident when an acquaintance placed his red baseball cap (the color of the Bloods gang) on a shovel. The gang ties also helped to explain how he exerted influence over others to assist him in retaliating against these serial slights. *See Gibbs*, 182 F.3d at 430 ("Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between

people is a central issue."); *see also* Fed. R. Evid. 404(b) (permitting evidence of other wrongs to prove, among other things, motive).

F.

Mooney next argues that the admission of a videotape of four firebombing demonstrations conducted with Molotov cocktails lacked probative value because none of the counts charged him with firebombing. Once again reviewing this evidentiary ruling for an abuse of discretion, *see Gibbs*, 182 F.3d at 429, we disagree.

The district court admitted the evidence to educate the jury about what Molotov cocktails do, which in turn helped the jury decide whether the Molotov cocktails qualified as destructive devices. Demonstrative evidence of this sort is probative so long as "the conditions of the experiment were identical with or similar to the conditions of the transaction in litigation." *Persian Galleries, Inc. v. Transcontinental Ins. Co.*, 38 F.3d 253, 258 (6th Cir. 1994) (upholding the admission of a videotape reenacting a burglary); *see also United States v. Metzger*, 778 F.2d 1195, 1204–06 (6th Cir. 1985) (upholding admission of a videotape demonstrating the impact of ten sticks of dynamite on a station wagon). All of that was true here. The videotaped detonation of similar Molotov cocktails helped prove whether they qualify as destructive devices and thus had some probative value. *See Metzger*, 778 F.2d at 1204 (noting that most dissimilarities in experiments go to the weight of the evidence, not its admissibility). Because the demonstration involved a similar device and explosion and because it was probative of disputed issues in the case (and because it was not unduly prejudicial, *see* Fed. R. Evid. 403), we see no abuse of discretion in the district court's ruling.

G.

Mooney next argues that the prosecution presented insufficient evidence to support his convictions. Our review of this type of challenge is limited, as we determine "whether, after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, a rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999). As our earlier synopsis of the facts underlying this case demonstrates, the record provides ample evidence upon which a reasonable jury could rely in convicting Mooney of each of the alleged crimes. To overcome this conclusion, Mooney points only to segments of his own testimony that contradict the testimony against him. But the mere assertion that the jury should have believed his testimony, not that of the other witnesses, including the testimony of accomplices who had pleaded guilty to some of the same charges, does not undermine the sufficiency of the government's case. Because the government's proof sufficed to convince a reasonable jury of Mooney's guilt, we also reject his last challenge to his conviction, that the district court erred in rejecting his motion for acquittal.

H.

Mooney also raises a series of challenges to his sentence, each unpersuasive. The district court abused its discretion, Mooney first asserts, by refusing to grant him a downward departure. We do not entertain such challenges unless the district court did not realize that it had the authority to depart downward. *United States v. Butler*, 207 F.3d 839, 843 (6th Cir. 2000). Mooney points to nothing in the record indicating that the district court failed to appreciate its authority in this regard,

and a review of the record shows why: the district acknowledged its discretion, saying "the court declines to exercise its discretion to depart upward or downward on the facts of this case and denies those motions." JA 515.

Mooney also argues that the district court erred by enhancing his sentence four points under U.S.S.G. § 2K2.1(b)(1)(B)—which increases the offense level based on the number of firearms involved in the offense—claiming the district court should not have attributed eight firearms to him. Mooney does not contest the inclusion of the five Molotov cocktails or of the .25 caliber pistol found in his residence. He does object, however, to considering two other weapons as conduct relevant to his offense, namely weapons possessed by his companions during the encounter at the hotel where Mooney threatened Davis into attempting to firebomb Henson's home. The Guidelines, however, contemplate precisely this kind of enhancement, explaining that "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" qualify as relevant conduct. U.S.S.G. § 1B1.3(a)(1)(B). Here, Mooney's accomplices possessed the firearms while jointly undertaking to make and possess a Molotov cocktail in the hotel room and while they attempted to coerce Davis into firebombing the Henson home. Mooney knew his accomplices had taken Davis's gun, and could reasonably foresee that they—namely, all of the gang members—might be using weapons to coerce Davis. Determining that eight firearms furthered the criminal activities was not error. And Mooney's argument about a ninth weapon, the .380 caliber pistol the jury acquitted him of possessing, is both irrelevant (since the district court explicitly did

- 14 -

not count that weapon, *see* JA 516 ("It's not necessary to [ ] reach the issue of the .380 for which Mr. Mooney was acquitted.")), and incorrect, *see United States v. Watts*, 519 U.S. 148, 157 (1997) (holding "that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence").

III.

For these reasons, we affirm.